*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-222

PAUL ZUKERBERG, APPELLANT

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, *et al*., APPELLEES.

Appeal from the Superior Court of the District of Columbia
(CAB-8004-13)

(Hon. Laura A. Cordero, Trial Judge)

(Argued May 29, 2014　　　　　　　　　　Decided August 21, 2014)

*Gary Thompson* for appellant.

*Richard S. Love*, Senior Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellee.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*:  In 2010, the District of Columbia Charter was amended to allow District residents to elect their Attorney General.  In this case, the court considered whether that amendment required the first election for the office of Attorney General to be held in 2014.  We heard oral argument on May 29,

2014. On June 4, 2014, we issued an order holding that the District must schedule an election in 2014 or, if that is not practically possible, as soon as practically possible in 2015. We thus reversed the trial court's dismissal of the suit brought by Mr. Zukerberg seeking to enforce this requirement, and we remanded the case to the trial court for further proceedings consistent with our decision. To ensure that this court was not the cause of further delay in complying with the 2010 Elected Attorney General Charter Amendment ("the 2010 Charter Amendment"), we gave only a summary of the reasoning for our holding in the June 4, 2014, order. We now publish this opinion to more fully explain our resolution of the issues presented in this case.

## I.    The District of Columbia Charter and Its Procedures for Amendment

Before we discuss the 2010 Charter Amendment that created the elected office of Attorney General, we review what the District of Columbia Charter is and how it may be amended.

As its residents are well aware, the District of Columbia is not a state. It is a federal district that was specially created for the seat of our national government by Congress pursuant to powers conferred in Article I of the United States

Constitution.[1]  Article I also gave Congress plenary legislative power over the federal district that became the District of Columbia.[2]  How Congress exercised that power to oversee the municipal affairs of the District from the late eighteenth century to the latter half of the twentieth century need not concern us.  Thus, we fast forward to 1973 when the District's local government took its current shape with the passage, by Congress, of the District of Columbia Home Rule Act.[3]

The Home Rule Act created the District of Columbia Charter ("the Charter"),[4] which in turn established a new "means of governance"[5] for the District.  Most important for the purpose of this discussion, Congress expressed its "intent . . . to delegate certain legislative powers to the government of the District of Columbia" and to "authorize the election of certain local officials by the

---

[1]  U.S. Const. art. I, § 8, cl. 17; *see also Feaster v. Vance*, 832 A.2d 1277, 1287 (D.C. 2003) (explaining that "[a]mongst political entities the District has a unique status; it is truly *sui generis* in our governmental structure") (internal quotation marks omitted).

[2]  U.S. Const. art. I, § 8, cl. 17 (granting Congress the power "[t]o exercise exclusive [l]egislation in all [c]ases whatsoever" over the contemplated federal district).

[3]  *See* D.C. Code § 1-201.01 et seq. (2012 Repl.).

[4]  D.C. Code §§ 1-203.01 to .03, 1-204.01 to .115.  The Charter itself had to be accepted "by a majority of the registered qualified electors of the District voting thereon in the charter referendum."  D.C. Code § 1-203.01.

[5]  D.C. Code § 1-203.01.

registered qualified electors in the District of Columbia."[6]  To this end, the Home Rule Act created the current 13-member legislative body, the Council of the District of Columbia, and the elected office of Mayor.[7]

The Charter was not intended to be immutable.  Congress, pursuant to its plenary legislative power, retained the ability to amend the newly created Charter through legislation.  In addition, Congress authorized a means by which the residents of the District could take matters into their own hands and amend the Charter in a two-step process that required first that their representatives on the Council pass legislation and then that that legislation be "ratified by a majority of

---

[6]  D.C. Code § 1-201.02 (a).  The motivation of Congress in taking these steps was to "grant to the inhabitants of the District of Columbia powers of local self-government; modernize, reorganize, and otherwise improve the governmental structure of the District of Columbia; and, to the greatest extent possible, . . . relieve Congress of the burden of legislating upon essentially local District matters." *Id.*  Congress nonetheless retained "ultimate legislative authority" over the District consistent with the mandate of Article I. *Id.*

[7]  D.C. Code §§ 1-204.01 to .13, 1-204.21 to .23.  The Home Rule Act also vested the judicial power with the pre-existing District of Columbia courts (the District of Columbia Court of Appeals and Superior Court), which had been created by Congress with the passage of the District of Columbia Court Reorganization Act of 1970, Pub. L. No. 91–358, 84 Stat. 475 (codified as amended at D.C. Code § 11-101 et seq. (2012 Repl.)). *See* D.C. Code § 1-204.31 (a).

the registered qualified electors of the District voting in the referendum held for such ratification."[8]

When the second mechanism to amend the Charter is employed, the Council initiates the process. A bill must first be introduced in the Council by a Councilmember, or by the Mayor or an independent agency[9] through the Council Chairperson.[10] This legislation is then considered by the Council in much the same way any bill is considered. The bill is usually assigned to an appropriate committee by the Council Chairperson.[11] Typically the committee will conduct a hearing, at which the Council receives testimony from the public for and against the bill.[12] If the committee wishes to move the bill forward, it will vote it out of committee, generally with a report.[13] The bill is then sent to the Committee of the

---

[8] D.C. Code § 1-203.03 (a).

[9] The Charter created several independent agencies for the District. *See* D.C. Code §§ 1-204.91 to .96.

[10] Rules of Organization and Procedure for the Council of the District of Columbia, Council Period 20, Rule 401 (2013) [hereinafter Council Rule]; *see* 60 D.C. Reg. 627 (2013).

[11] Council Rule 405 (a)(1).

[12] *See* Rules of Organization and Procedure for the Committee on the Judiciary and Public Safety, Council Period 20, Article VI (2013) [hereinafter Committee Rules].

[13] Committee Rules, Sec. 502.

Whole, which means it is considered by all 13 members of the Council.[14] In order to pass, the bill must "be read twice in substantially the same form, with at least 13 days intervening between each reading."[15] After passage, the bill is sent to the Mayor for his approval or veto.[16] The Mayor may communicate his approval either by signing the legislation or simply by failing to veto it within 10 days of receipt.[17]

At this point in the Charter amendment process, the electorate gets its say via referendum. This referendum is coordinated by the Board of Elections[18] ("BOE"), which receives legislation seeking to amend the Charter after it has been passed by the Council and approved by the Mayor.[19] The BOE first schedules,

---

[14] Council Rule 231 (a), (c)(1).

[15] D.C. Code § 1-204.12 (a) (2014 Supp.).

[16] D.C. Code § 1-204.04 (e) (2014 Supp.); *see* Council Rule 417.

[17] D.C. Code § 1-204.04 (e). A mayoral veto may be overcome by a two-thirds vote of the Council cast within 30 days of receiving the veto. *Id.*

[18] Effective April 27, 2012—prior to the commencement of litigation in this case—the Board of Elections and Ethics ("BOEE") was separated into the Board of Elections ("BOE") and the Board of Ethics and Government Accountability ("BEGA"). *See* D.C. Code §§ 1-1162.02, 1-1163.05 (2012 Repl.). Although Mr. Zukerberg lists the "Board of Elections and Ethics" as an appellee, we refer to the actual party in interest, the BOE, throughout this opinion.

[19] 3 DCMR § 1801.2 (2012).

publicizes, and holds a public hearing.[20]  A primary purpose of this hearing is to formulate for any proposed Charter amendment "[a]n abbreviated and impartial summary statement of no more than one hundred fifty (150) words . . . express[ing] the chief purpose of the amendment" to put on the ballot.[21]  This summary statement "shall accurately and impartially reflect the meaning and intent of the proposed Charter amendment and shall not intentionally create prejudice for or against the measure."[22]  The BOE then publishes this ballot summary in the District of Columbia Register, along with the legislation that would amend the Charter.[23]  The BOE also notifies both "the Mayor and the Chairman of the Council, either by personal delivery or by certified mail, of the exact wording of" the ballot summary.[24]

Any registered qualified elector who seeks to "raise any objections [to,] and/or correct any alleged inaccuracies" in[,] the ballot summary may request a

---

[20]  3 DCMR §§ 1801.6, 1801.7, 1802.1 (2012).

[21]  3 DCMR § 1802.1 (a).  The BOE also drafts "[a] short title of no more than twenty (20) words by which the amendment will be readily identifiable and distinguishable from other measures which may appear on the ballot."  3 DCMR § 1802.1 (b).  We limit our discussion to the ballot summary, since no issue is presented in this case related to the title of the referendum.

[22]  3 DCMR § 1802.2.

[23]  3 DCMR § 1802.4.

[24]  3 DCMR § 1802.5.

hearing before the BOE.[25] Absent a request for a hearing, the ballot summary, "as published by the [BOE] in the *D.C. Register*, shall be considered to be accepted at the expiration of [a] ten (10) day review period."[26] Even then additional steps are taken before the ballot summary is actually placed on the ballot. The BOE holds another public meeting to certify the ballot summary and announce that the proposed Charter amendment will be brought before voters in an election.[27] After this second public meeting, the BOE publishes in the D.C. Register and in at least two newspapers of general circulation: (1) the entire Act, or the provision of the Act that would amend the Charter; (2) the ballot summary as certified by the BOE; and (3) a statement that the proposed Charter amendment will be presented to voters in an election.[28] Only after this process is completed is the certified ballot summary actually printed on the ballot.[29] This is the language that the voters see when they go to the polls.

---

[25] 3 DCMR § 1803.1 (2012).

[26] 3 DCMR § 1803.2.

[27] 3 DCMR § 1804.1 (2012).

[28] 3 DCMR § 1804.3.

[29] 3 DCMR § 1804.2.

If a majority of the voting public votes to ratify the Charter amendment as described in the ballot summary, the amendment is then sent to Congress[30] for a congressional review period applicable to all District of Columbia legislation.[31] If Congress does not act, the Charter amendment enacted by the Council and ratified by the electorate becomes law.[32]

## II.    Facts and Procedural History[33]

### A.  The 2010 Amendment to the District Charter

In January 2009, Councilmember Phil Mendelson introduced D.C. Bill No. 18-65, the Attorney General for the District of Columbia Clarification Act. A primary aim of the bill was to amend the Charter to make the position of Attorney

---

[30]  D.C. Code § 1-206.02 (c)(1).

[31]  This review period, however, is longer; it lasts 35 days.  D.C. Code § 1-203.03 (b).  For legislation which does not seek to amend the Charter, the review period lasts 30 days.  D.C. Code § 1-206.02 (c)(1).

[32]  D.C. Code § 1-203.03 (b).

[33]  In reconstructing this history, this court consulted both the materials in the trial court record and the Council's written and audio records of its proceedings, which are publicly available on the District's Council and Office of Cable Television websites.

General of the District of Columbia an elected, rather than an appointed, position.[34] Because the Council is not empowered to amend the Charter directly, the part of the bill proposing this change (Title II) was effectively a request for Congress to do so. Thus, the text of the bill provided that Title II would "apply upon enactment by Congress." Other aspects of the legislation (e.g., the provisions in Title I setting forth minimum qualifications, a residency requirement, and a four-year term) did not necessitate amending the Charter and simply required passage by the Council and passive review by Congress.[35]

The bill was referred to the Committee on the Judiciary and Public Safety, which held a public hearing in July of 2009. The bill was voted out of committee in December 2009 with amendments and a report recommending approval by the full Council. Thereafter, it moved through the Council with relative rapidity and little opposition. Upon its first reading in January 2010, all twelve of the Councilmembers present approved the bill. The day before its scheduled second reading on February 2, 2010, Councilmember Mendelson circulated a memorandum to his colleagues on the Council proposing an "Amendment in the

---

[34] The impetus behind the legislation was not addressed in the record presented to the court and is beyond the scope of this opinion.

[35] See *supra* note 31.

Nature of a Substitute" to the bill and explaining the rationale for each proposed change. Specifically, he proposed an amendment to Title II of the bill, adding a subsection stating that "[t]he first election for the position of Attorney General shall be after January 1, 2014." He explained in his memorandum that this "amendment clarifies that the first election to be held for the position of Attorney General shall coincide with the election for Mayor in [the] 2014 general election." At the second reading on February 2, 2010, the bill was approved 12-1.[36] The legislation was sent to then-Mayor Adrian Fenty, who did not veto it within the prescribed timeframe and so approved the Attorney General for the District of Columbia Clarification and Elected Term Amendment Act of 2010 ("the 2010 Act").[37] This legislation, assigned D.C. Act No. 18-351, was then transmitted to the U.S. Congress.

---

[36] At the time, the members of the Council were Yvette Alexander, Muriel Bowser, David Catania, Jack Evans, Vincent Gray, Phil Mendelson, Tommy Wells, Marion Barry, Kwame Brown, Mary Cheh, Jim Graham, Michael Brown, and Harry Thomas. Only Councilmember Evans, who had voted for the legislation at the first reading, voted against the bill in its final form with its new specificity about the timing of the election. *See* Council of the District of Columbia: Twenty-Sixth Legislative Meeting, Public Hearing, Committee of the Whole (D.C. Office of Cable Television broadcast Feb. 2, 2010).

[37] *See* D.C. Code § 1-204.04 (e).

Once the legislation reached Congress, nothing happened. This congressional inaction allowed the non-Charter amending provisions of the 2010 Act to go into effect in May 2010. But it stymied amendment of the Charter pursuant to Title II, the portion of the legislation calling for an elected Attorney General, for which affirmative action by Congress was required. The Council then made the decision to change tactics and to seek to amend the District Charter by means of local action. In the summer of 2010 and then again in the spring of 2011, Councilmember Mendelson introduced, and the Council passed, a series[38] of emergency and temporary laws[39] to allow for Title II of the 2010 Act to become effective upon ratification by the electorate voting in a referendum. In passing these emergency and temporary laws, the Council neither revisited the text of the legislation it had already passed nor sought to amend the provision of Title II that referred to its enactment by Congress to become effective.

With the Council's decision to seek to amend the Charter by means of local action, the work of the BOE began. As required by regulation, the BOE submitted

---

[38] D.C. Acts Nos. 18-443, 18-468, 19-51.

[39] The Council has two fast-track means by which to pass legislation, the effects of which are time-limited: Emergency legislation is effective for 90 days, while temporary legislation may remain effective for not more than 225 days. Council Rules 412, 413.

for publication in the D.C. Register a "Notice of Public Hearing: Receipt and Intent to Formulate Proposed Ballot Language," which included the entire 2010 Act.[40] After conducting the requisite public meeting to formulate the ballot summary,[41] the BOE submitted the resulting ballot summary for publication, along with the text of the 2010 Act.[42] The summary statement read as follows:

> Currently, the Attorney General for the District of Columbia is appointed by the Mayor and confirmed by the Council of the District of Columbia. This Charter Amendment, if passed, would amend the District of Columbia Home Rule Act to allow voters to elect the Attorney General for a 4-year term of office.
>
> A candidate for the position of Attorney General must meet certain qualifications and requirements which include being a registered voter in the District of Columbia, and a member in good standing of the District of Columbia Bar for at least five years prior to assuming the position of Attorney General.

---

[40] 57 D.C. Reg. 5726 (2010).

[41] *See* 57 D.C. Reg. 6217 (2010) ("The [BOE] at its Board meeting on Wednesday, July 7, 2010 formulated the short title and summary statement of the Proposed Charter Amendment IV.").

[42] 57 D.C. Reg. 6217 (2010).

> *If voters approve of this amendment and the U.S.*
> *Congress does not reject the measure, residents of the*
> *District of Columbia would begin voting for the Attorney*
> *General in 2014.*[43]

There is no indication in the record that the BOE received any objection to the ballot summary from the Council, the Mayor, or anyone else during the requisite 10-day review period. Accordingly, the BOE subsequently published certification of the summary and announced that the amendment would be presented to voters at the general election to be held Tuesday, November 2, 2010.[44] The amendment was subsequently ratified by almost 76 percent of the electorate. After the mandatory, passive period of congressional review[45] the Elected Attorney General Charter Amendment was enacted[46] and the District Charter was officially amended.

---

[43]  *Id.* (emphasis added).

[44]  57 D.C. Reg. 7511 (2010).

[45]  See *supra* note 31.

[46]  *See* D.C. Code § 1-204.35.

**B. The 2013 Legislation to Delay the Election**

In January 2013, Mayor Vincent C. Gray wrote a letter to Councilmember Mendelson, who had become Council Chairperson.[47]  The letter began with the premise that "[i]n January 2015, pursuant to [the 2010 Charter Amendment], an elected Attorney General for the District of Columbia will for the first time take office."  Mayor Gray then explained that "[o]ur current Attorney General Irvin Nathan and the [Office of the Attorney General ("OAG")] staff have been studying the practical consequences" of having an elected Mayor and an elected Attorney General, where "neither will be subordinate to the other, and both will serve in the Executive Branch."  As a result, the Mayor determined that "several significant changes in the law are needed to ensure the best prospects for [the] long-term success of this new arrangement for both the Office of the Mayor and the subordinate agencies[,] and for the OAG."  To this end, the Mayor asked the Chairperson to introduce legislation on the Mayor's behalf.[48]  The Mayor urged the Council to "take prompt and favorable action" on his bill in order for the District to

---

[47]  Councilmember Mendelson was elected as Chairperson of the Council in November 2012.  *See* 59 D.C. Reg. 14101 (2012).

[48]  The Bill proposed moving agency General Counsels from the Attorney General's reporting line to the Mayor's reporting line, establishing a Mayor's Office of Legal Counsel, and transferring the OAG's Child Support Services Division to the Department of Human Services.

"be prepared for the coming transition . . . before the electoral process for the 2014 Attorney General election begins in April, 2014."

As requested, in February 2013 Chairperson Mendelson introduced the Mayor's legislation, D.C. Bill No. 20-134, the Elected Attorney General Implementation and Legal Service Establishment Amendment Act of 2013 ("the 2013 Act"). The Committee on the Judiciary and Public Safety held a public hearing in March 2013. The bill was voted out of Committee on July 3, 2013, and although it had been substantially revised,[49] the understanding as reflected by the Committee Report was still that "[i]n April 2014, the first nominees for Attorney General will be on the primary ballot, and the first elected Attorney General will take office in January 2015."[50]

Before the Council conducted its first reading and vote on the bill on July 10, 2013, however, Councilmember Evans (the sole councilmember to have voted against the 2010 legislation seeking to authorize the election of the Attorney

---

[49] *See* D.C. Council, Comm. on the Judiciary & Pub. Safety, Report on Bill 20-134 at 1 (July 3, 2013).

[50] *Id.* at 2.

General)[51] introduced an amendment[52] addressing the timing of an election for an Attorney General in the District: "Until such time as an Attorney General is elected under § 1-204.35, which time shall not be before January 1, 2018, the Attorney General for the District of Columbia shall be appointed by the Mayor with the advice and consent of the Council pursuant to § 1-523.01."[53] The bill, with this "delay provision," passed a first vote in July 10, 2013, and a final vote on October 1, 2013. On October 22, 2013, the Mayor returned the legislation to Chairperson Mendelson without signing it. He explained in a letter that he thus "allow[ed] it to become law[,] but without [his] full endorsement." Among other things, the Mayor stated that he objected to the Council's decision to delay the

[51] See *supra* note 36.

[52] *See* Council of the District of Columbia: Fourteenth Legislative Meeting, Committee of the Whole (D.C. Office of Cable Television broadcast July 10, 2013).

[53] Before adding this language, Councilmember Evans apparently sought advice about the Council's authority to postpone the election and received two different responses. *See* Council of the District of Columbia: Mark-up Committee on the Judiciary and Public Safety (D.C. Office of Cable Television broadcast June 28, 2013). First, John Hoellen, Deputy General Counsel for the Council, wrote a memo dated July 2, 2013, in which he concluded that the Council did not have legal authority to delay the election. On July 9, 2013, Attorney General Nathan wrote a letter to Councilmember Evans, in which he gave his opinion that the Council had the authority to delay the election, but advised against it. Attorney General Nathan explained that "[t]he District's voters by a substantial margin supported the Charter [A]mendment . . . and did so with the justifiable expectation of voting for one in 2014 who would take office in January 2015 concurrent with the next [m]ayoral term." Attorney General Nathan advised Councilmember Evans that the voters' "expectation[s] should be respected and fulfilled."

election for Attorney General because "when District citizens voted in favor of this referendum, they did so with the expectation of electing an Attorney General in 2014." After the requisite period of passive congressional review, the 2013 Act became effective in December 2013.[54]

Meanwhile, appellant Paul Zukerberg declared his candidacy for Attorney General in November 2013. Shortly thereafter[55] he filed a complaint in the Superior Court, asking that the court declare the delay provision in the 2013 Act to be in violation of the District Charter which, as amended in 2010, he contended required an election in 2014. Further, Mr. Zukerberg asked for injunctive relief prohibiting both the BOE from removing the office from the 2014 ballot and the Council from taking any action to inhibit the creation of the elected office of Attorney General.[56] The Council and the BOE filed a motion to dismiss Mr.

---

[54] *See* D.C. Law No. 20-60; 60 D.C. Reg. 15487 (2013); D.C. Code § 1-301.82.

[55] Mr. Zukerberg had filed an earlier suit, which was removed to the United States District Court for the District of Columbia. He subsequently dismissed this complaint voluntarily.

[56] In December 2013 Mr. Zukerberg filed a motion for preliminary injunction, which was denied. After the trial court denied this motion, Mr. Zukerberg appealed. In an unpublished order, this court affirmed the Superior Court's denial of Mr. Zukerberg's motion for a preliminary injunction without expressing "any opinion on the underlying merits of the case," which we noted had yet to be ruled upon.

Zukerberg's suit with prejudice in January 2014. The Superior Court granted this motion, reasoning that "based on the ordinary meaning of the words [from the 2010 Act] 'after January 1, 2014,' the 2013 Act does not conflict with the 2010 Charter amendment." This appeal followed.

## III.    Analysis

Comparable to a state constitution, the District of Columbia has a Charter;[57] and just as with a state constitution, the dictates of the Charter and any lawful amendments thereto cannot be countermanded by simple legislation. *Price v. District of Columbia Bd. of Elections & Ethics*, 645 A.2d 594, 599 n.15 (D.C. 1994) ("[T]he Council may not enact legislation that is inconsistent with the Charter Amendments."). Thus, in order to determine whether the Council had the unilateral authority to mandate that an election for the office of Attorney General would "not be before January 1, 2018," we must examine and discern the meaning

---

[57]    *See*, *e.g.*, *Convention Ctr. Referendum Comm. v. Bd. of Elections & Ethics*, 399 A.2d 550, 552 (D.C. 1979) (equating a Charter Amendment with a constitutional provision); *see also Feaster v. Vance*, 832 A.2d 1277, 1287 (D.C. 2003) (favorably citing *Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 776 (D.C. Cir. 1998), which characterized the District Charter established by the Home Rule Act as "[s]imilar in certain respects to a state constitution").

of the amendment to the Charter providing that an election for an Attorney General in the District "shall be after January 1, 2014."[58]

Mr. Zukerberg conceded at oral argument that the meaning of the language in the 2010 Charter Amendment is ambiguous, but he asserts that based on the legislative history and other "extrinsic evidence," it should be interpreted to mean "in 2014." Using this interpretation, Mr. Zukerberg argues the 2010 Charter Amendment renders invalid the 2013 Act passed by the Council regarding the office of the Attorney General, in particular the so-called "delay provision" for the scheduling of an election. For its part, the Council and the BOE contend that the language of the 2010 Charter Amendment is unambiguously open-ended and clearly authorizes the election of an Attorney General at any time beyond January 1, 2014, on a date left entirely to the Council's discretion.[59] Alternatively, the

---

[58] D.C. Code § 1-204.35 (e).

[59] We consider this a fair characterization of the Council and the BOE's argument. Although they disclaim an intent to delay the election indefinitely, they also argue that there is no need for this court to determine whether there is a reasonableness limitation on their exercise of discretion. In other words, they seek our acknowledgement of the Council's unbounded discretion to schedule the first Attorney General election. Indeed, they assert "plenary authority" in this matter. Further indicating that their argument is simply that District voters should "trust the Council"—and not that the Council and the BOE truly think the Council's discretion is restricted in any enforceable way—they give no indication where the

(continued…)

Council and the BOE assert that if the 2010 Charter Amendment language is deemed ambiguous, it should be interpreted as they contend it was originally intended: to give the Council complete discretion in scheduling an election for the office of Attorney General. With this interpretation, the Council and BOE see no conflict between the 2010 Charter Amendment and the delay provision in the 2013 Act.

## A. Plain Language: "shall be after January 1, 2014"

The first question we confront is whether the meaning of the language "shall be after January 1, 2014" in the 2010 Charter amendment is plain. *See Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (explaining that when interpreting legislation, "[w]e must first look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning" (internal quotation marks omitted)); *see also Thorne v. United States*, 55 A.3d 873, 878 (D.C. 2012) (recognizing that "[t]he primary and general

(…continued)
legal foundation of a reasonableness limitation would come from or by what means it could be enforced.

rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used" (internal quotation marks omitted)). We construe "[t]he words of the statute . . . according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores*, 470 A.2d at 753 (internal quotation marks omitted).

We agree with the Council and the BOE that the "common and ordinary meaning of the word 'after'" is "following in time or place," or "later in time." However, that does not answer the complete question before us, namely, when an election must be held, if an election "shall be after" a date certain. We can readily identify several possibilities. "Shall be after January 1, 2014" could mean "the day immediately after." In contrast, it could also mean "at any point after" (including, possibly, never, if the meaning of "shall be after" is construed as "shall not be before").[60] Or it could, as we ultimately concluded, mean something in between.

---

[60] Looking to the authority cited by the parties, Mr. Zukerberg references statutes that created prohibitions that begin immediately after the given date, *see* D.C. Code § 7-742 (2012 Repl.); D.C. Code § 8-108.03 (2012 Repl.); D.C. Code § 24-201.72 (2012 Repl.), and the Council and BOE cite cases in which a statute set to take effect after a given date was held to apply in a continuous manner to events that occurred well after the effective date. *See Berkley v. D.C. Transit, Inc.*, 950 A.2d 749, 752 & n.2 (D.C. 2008); *Thomas v. District of Columbia*, 942 A.2d 1154, 1162 (D.C. 2008); *Nat'l Broad. Co. v. F.C.C.*, 132 F.2d 545, 550 (D.C.

(continued…)

Thus, because the temporal component of the Charter amendment allows more than one meaning, we determine that it is ambiguous.

The Council and the BOE argue that only their interpretation of the text of the statute—namely, the interpretation that "shall be after January 1, 2014" allows an election at any point after that date—is reasonable. They argue that this open-ended time frame was necessary because the 2010 Charter Amendment was not "self-executing" and the Council needed time to "pass the legislation necessary to implement it." As a textual matter, this argument has no support. Unlike the amendment at issue in *Jackson v. District of Columbia Board of Elections and Ethics*, a case on which the Council and BOE rely, there is nothing in the 2010 Charter Amendment indicating that it is not self-executing or that it required the passage of additional legislation.[61] Because we disagree with the premise that the

---

(…continued)
Cir. 1942). However, these authorities are of little assistance to Mr. Zukerberg where he did not argue that a January 2, 2014, election was required; likewise these authorities are unhelpful to the Council and BOE, since the issue is not whether the District may continue to elect its Attorney General well into the future, but whether it must begin doing so within 2014.

[61] *See* 999 A.2d 89, 97 (D.C. 2010) (en banc) (noting that the 1977 Charter Amendment "affirmatively required the Council to 'adopt such acts as are necessary to carry out [its] purpose . . . within 180 days of the effective date of [the Act]'" (citing D.C. Code § 1-204.107)); *see also Convention Ctr. Referendum*

(continued…)

2010 Charter Amendment was not self-executing, we reject the appellees' argument that we can discern only one reasonable interpretation of the temporal component of the Charter Amendment without resort to other interpretive tools.

## B. Considering the Charter Amendment as a Whole

To resolve the temporal ambiguity in the 2010 Charter Amendment, we look to its text "as a whole." *District of Columbia v. Place*, 892 A.2d 1108, 1113 (D.C. 2006) (internal quotation mark omitted). First, this leads us to reject an interpretation of "shall be after" as "not before, but possibly never." That the Charter Amendment contemplated that the District would adopt a new way of placing an Attorney General in office—via election instead of mayoral appointment—cannot be questioned. The first subsection of the Charter Amendment requires that "[t]he Attorney General for the District of Columbia *shall be elected* on a partisan basis by the registered qualified electors of the

---

(…continued)

*Comm.*, 399 A.2d at 551-52 (acknowledging that "in general, constitutional provisions are presumed to be self-executing," but concluding that the Charter Amendment at issue was not because, *inter alia*, it spoke "in mandatory terms to the [District] Council concerning enabling legislation").

District."[62] To discern when "after January 1, 2014"[63] this shift should occur, we note again that the first subsection requires a partisan election and that the third subsection of the Charter Amendment provides that the term of office shall be four years and shall "coincide with the term of office of the Mayor."[64] Mayoral elections are also partisan affairs—that is, they require the political parties to identify their candidates in primaries that are scheduled before the general election—and 2014 is a mayoral election year. A natural reading of the Charter Amendment as a whole, therefore, is that there was an intention to hold the Attorney General election in 2014 and to permit that election to be held on the same partisan election schedule as the 2014 mayoral election.

The Council and the BOE argue, however, that the inclusion of a "Reappointment Provision"[65] in the 2010 Act, addressing how the office of Attorney General was to be filled until the first election was held, strongly suggests

---

[62] D.C. Code § 1-204.35 (a), (c) (emphasis added).

[63] D.C. Code § 1-204.35 (e).

[64] D.C. Code § 1-204.35 (c).

[65] The Reappointment Provision, codified at D.C. Code § 1-301.82, is contained in Title I of the 2010 Act, the portion of the legislation that did not amend the Charter. Section 102 of Title I provides that "[u]ntil such time as an Attorney General is elected under [§] 201, the Attorney General for the District of Columbia shall be appointed," and "[b]e eligible for reappointment." D.C. Law No. 18-160.

that the Council intended to preserve its authority to set the date of the first election for Attorney General, because otherwise this Reappointment Provision would be superfluous. More specifically, the Council and the BOE argue that if the election was required to be held in 2014, there would never be a time subsequent to the ratification of the 2010 Charter Amendment when the Mayor would have to reappoint an Attorney General, given that the provision did not apply to the incumbent on the effective date of the act. First, we disagree that this provision could not have come into play before 2014. As Mr. Zukerberg explains, for example, had the sitting Attorney General in 2010, Peter Nickles, resigned before January 1, 2011, then Mayor Fenty would have appointed a new Attorney General. This Attorney General could have then been "reappointed" by Mayor Gray. In any event, the Council and the BOE ignore the early history of the 2010 Charter Amendment which indicates that the Reappointment Provision is best explained as a vestige, left over from the original plan to amend the Charter by act of Congress. Given that this was an endeavor of unknown timing, it made sense to include a Reappointment Provision. When the decision was made to shift gears and seek to amend the Charter by means of a referendum, the statutory provisions created by the 2010 Act (the non-Charter-amending provisions that were already law at that

point) were not altered. Rather, a series of temporary and emergency laws were passed to effect this change.[66] In light of this history, we are hard-pressed to interpret this provision as conclusive statutory evidence that "shall be after January 1, 2014" must be subject to an "at any time after" interpretation.

### C. Legislative History

Although the text is the primary source for determining legislative intent, when the text is ambiguous, we look to legislative history. *See Stevenson v. District of Columbia Bd. of Elections & Ethics*, 683 A.2d 1371, 1376 (D.C. 1996). There we find further support for a reading of the 2010 Charter Amendment that requires an election for the office of Attorney General to take place in 2014. As we explain below, we consider the full legislative history of the 2010 Charter Amendment—both the history of its drafting in the Council and the history of its review by referendum—in order to determine the legislative intent of the two essential players in its passage, the Council and the electorate.

---

[66] See *supra* notes 38-39.

### 1. Potential Sources of Legislative Intent

First we must identify the potential sources of legislative intent and address the arguments of the Council and the BOE that we should consider only the intent of the Council when seeking to discern the meaning of the 2010 Charter Amendment. The Council and the BOE argue that the voters have no discernible intent to consider and even if they did, "their expectations as to its meaning ha[ve] little significance on the precise issue of when an Attorney General election should be held," "because the voters had no hand in drafting the 2010 [Act]." We reject both arguments.

Preliminarily, we reject the Council and the BOE's argument that the electorate does not have a "precisely discernible" intent to consider in the context of a Charter Amendment by referendum, because voters are only asked whether they want to ratify the legislation already passed by the Council. This argument ignores the mechanics of the referendum process and the careful scripting of the ballot initiative that is put before the voting public. Although it is true that voters are asked to ratify legislation already passed by the Council, the choice put to voters is encapsulated in the ballot summary. Great care is taken to ensure that the

ballot summary language presents the choice to the voters "accurately and impartially."[67] In effect, when the ballot summary of the Charter-amending legislation passed by the Council is put before the voters, the electorate's vote is a "third reading" of that legislation.[68]

The Council and the BOE also argue that the electorate's intent, even if it could be discerned, should be disregarded. We cannot agree. This argument disregards the limitations on the Council's power in amending the Charter. Unlike the typical legislative scenario, where we delegate to our elected representatives the power to make laws, the Council cannot go it alone to amend the Charter. Instead, as explained above, if the Council opts not to rely on Congress to amend the Charter, it must seek and obtain the specific approval of the voting public for any proposed amendment. Accordingly, this court may consider the intent of both the Council and the electorate when interpreting a Charter Amendment enacted by

---

[67] 3 DCMR § 1802.2.

[68] Thus, perhaps better than the legislative history of the Council—which may reflect competing views and unresolved debates—a ballot summary, if as here it expressly addresses the issue subject to debate, can be an excellent means of discerning the voting public's intent when a Charter amendment is put before the electorate for its approval or rejection.

referendum.

This Court's decision in *Jackson*, 999 A.2d 89, 101, on which the Council and the BOE heavily rely, is not to the contrary; in particular, their quotation of *Jackson* for the proposition that the Council's intent is "paramount" is taken wholly out of context. *Jackson* addressed a distinct circumstance: The issue was whether a 1977 Charter Amendment[69] that had given voters legislative powers— the right to approve certain measures by initiative or reject specific legislation passed by the Council by referendum[70]—allowed appellants to put before the voting public an initiative that the BOE concluded would have the effect of violating the District of Columbia Human Rights Act (the "HRA").[71] Unlike in this case where the 2010 Charter Amendment addressed the current subject of controversy, the 1977 Charter Amendment authorizing initiatives had not acknowledged that the power of initiative was limited by the nondiscrimination

---

[69] This Charter Amendment became law after the passage and ratification of the Initiative, Referendum, and Recall Charter Amendment Act of 1977, D.C. Code §§ 1-204.101 to .107, 1-204.111to .115 (2012 Repl.).

[70] The power to reject Council legislation by referendum, *see* D.C. Code § 1-204.101 (b), should not be confused with the power to ratify legislation proposing to amend the Charter by referendum. *See* D.C. Code § 1-201.01 et seq.

[71] D.C. Code § 2-1401.01 et seq. (2012 Repl.). The initiative sought to define marriage in the District as only between a man and a woman.

provisions of the HRA; it was silent on this issue. The Council addressed this question in the subsequently enacted Initiative, Referendum, and Recall Procedures Act of 1979 (the "IPA"),[72] and qualified the power of initiative in this manner. Relying on the IPA, this court upheld the BOE's rejection of the appellant's proposed initiative.

Because the 1977 Charter Amendment in *Jackson* concerned a transfer of legislative power, very much on the Court's mind was the origin and scope of legislative authority in the District—an issue which has no bearing on this case. The court explained that "[i]n other jurisdictions, it is the people who, through state constitutions, have conferred rights on the legislature, but have reserved general legislative power to themselves as well," but that in the District, Congress, in passing the Home Rule Act, had given "a broad grant of legislative power *to the Council alone*." 999 A.2d at 100. The Court then observed that "the Council had to decide the extent of the legislative power it would share with the people." *Id.* at 101. And it was in that context that the Court stated that the Council's intent was

---

[72] D.C. Code §§ 1-1320 to -1326 (2012 Repl.).

"paramount."[73]  *Id.*

Moreover this Court did not hold in *Jackson*, as the Council and the BOE contend, that ballot summary language should never be considered when a court is interpreting ambiguous language in a Charter Amendment.  There was no cause to do so in *Jackson*, because there was no ambiguous language to interpret.  The 1977 Charter Amendment creating the power of citizen initiative (and its corresponding ballot summary) contained *no* reference to the HRA or its limitation on the right of initiative created by that Charter Amendment.  Appellants in *Jackson* argued that the silence in the ballot summary for the 1977 Charter Amendment was proof of its "plain" meaning.  In a footnote, the court "reject[ed] this argument," noting that the ballot summary was simply a summary that "asked voters to approve [the] creation of [a] right . . . but did not ask them to vote as to the scope of th[at] [right]."  999 A.2d at 102 n.19.  Thus, if anything, *Jackson* supports the

---

[73]  The Court made clear that this descriptor could not be universally applied to the Council's intent by acknowledging and distinguishing *District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349 (D.C. 1980) (en banc), a case where the court had "recognized that, while the Council's interpretation of its own authority [under the Home Rule Act, which was passed by Congress, not the Council] obviously commands great respect, . . . [it is not] entitled to weight beyond the inherent persuasiveness of the position taken in a particular instance."  *Jackson*, 999 A.2d at 101 n.17 (internal quotation omitted).

proposition that the actual text of a ballot summary—asking voters to approve the creation of a right based on the text of a proposed Charter amendment—must be evaluated by this court; it provides no support for the proposition that express text of a ballot summary can simply be ignored.

## 2. The Intent of the Council and the Electorate

The Council's intent in enacting the "after January 1, 2014" language in the 2010 Act is demonstrated principally in Councilmember Mendelson's February 1, 2010, memorandum to his fellow Councilmembers, circulated the day before the second reading of the 2010 Act. In that memorandum and attached documents, Councilmember Mendelson explained the addition of the "shall be after January 1, 2014" language, which had not appeared in the first reading of the bill. He told his colleagues that "[t]he amendment clarifies that the first election to be held for the position of Attorney General shall coincide with the election for Mayor in [the] 2014 general election." Having received this explanation of the "shall be after January 1, 2014" language, the Council, without any objection to this amendment, passed the bill as amended the following day.

At oral argument, the Council and the BOE dismissed Councilmember Mendelson's explanation of "shall be after January 1, 2014" language as merely indicative of the intent of a lone legislator. This is an unpersuasive minimization of his role. Councilmember Mendelson was not only the architect of the 2010 legislation, but also the author of the amendment containing the precise language we are called upon to interpret. *See Luck v. District of Columbia*, 617 A.2d 509, 515 (D.C. 1992) ("It is the sponsors that we look to when the meaning of the statutory words is in doubt." (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394–95 (1951))). He informed his colleagues that his amendment was intended to "clarif[y]" when the first election for Attorney General was to be held, and, having received this explanation, they voted for the bill as amended. We find this piece of legislative history highly probative of the Council's collective intent to have the first election for the office of Attorney General in 2014.[74]

---

[74] Notwithstanding Councilmember Mendelson's clarification, the Council and the BOE argue that the choice of language—"after January 1, 2014"—reflects a willingness to leave the timing of the election open-ended. They call our attention to the language of a failed proposed amendment by Councilmember Tommy Wells that would have created a new office of "District Attorney," and, in the Council and BOE's words, "substituted the unequivocal command that '[t]he first election for [that office] shall take place *in 2014*.'" But as the Council and the BOE concede, Councilmember Wells's unsuccessful amendment introduced "major changes to the bill, switching its focus to the creation of a District Attorney," while allowing for the continued appointment of the Attorney General.

(continued…)

We find further support for this conclusion in the Council's failure to raise an objection to the BOE's formulation of the ballot language summarizing the 2010 Act, which stated that, if the Charter Amendment were approved, "residents of the District of Columbia would begin voting for the Attorney General in 2014." This language went through a very precise, transparent, multi-step process of drafting and adoption, providing a period of public review and mechanisms by which anyone could contest the formulation of the ballot summary drafted by the BOE.[75] And the Council was given special consideration: Pursuant to regulation, the Chairman of the Council is entitled to receive a copy of the final language either personally or by certified mail.[76] That the Council was on notice of the ballot summary language and tacitly approved it also informs our assessment of the Council's intent.

---

(…continued)

Given the sweeping nature of Councilmember Wells's proposed change, we cannot presume that this "put the Council on notice of the distinction between an election that would take place 'in 2014' and one that would be held 'after January 1, 2014,'" as appellees suggest. Rather, we deem it more likely that these "major changes" prompted the Council's rejection of Councilmember Wells's proposal, not the "unequivocal command" of "in 2014."

[75] *See* 3 DCMR § 1800 et seq.

[76] 3 DCMR § 1802.5.

This leads us to the critical point in the 2010 Charter Amendment's history: the day District residents went to the polls, were given ballots containing the approved ballot summary language, and voted. They voted for the Charter Amendment as described in the ballot summary, i.e., they voted to amend the Charter to allow for an election for the office of Attorney General "in 2014." We conclude in this case that the ballot summary language that the voters saw when they went to the polls perfectly reflects the electorate's intent in passing the 2010 Charter Amendment.[77]

The Council and the BOE strongly urge us, however, to consider what happened after the 2010 Act was passed by the Council and ratified by the electorate so as to amend the Charter: They assert that the delay provision in the 2013 Act sheds light on the intent of the Council (if not the intent of the electorate) in amending the District Charter to allow the election of an Attorney General.

---

[77] We reject the Council and the BOE's argument that the 76 percent of the voting public who ratified the 2010 Charter Amendment did not rely on the ballot summary because they "kn[e]w that it [was] that actual language [of the 2010 Act], not the ballot summary, that they [we]re voting to ratify." The Council and the BOE appear to assume that the voters had the text of the proposed Charter Amendment either memorized or readily at hand when they cast their votes. This expectation of the District's voters is inconsistent with the BOE's detailed process of scripting and adopting the ballot summary; these regulations suggest a tacit acknowledgement that the summary is very important, because it will likely form the basis of a voter's decision.

"The views of a subsequent [legislative body] form a hazardous basis for inferring the intent of an earlier one. . . . The interpretation of statutes is, in the final analysis, the responsibility of courts, not of subsequently elected legislative bodies." *Winters v. Ridley*, 596 A.2d 569, 577 (D.C. 1991) (Schwelb, J., concurring) (footnote and internal quotation marks omitted); *see also Tippett v. Daly*, 10 A.3d 1123, 1132 (D.C. 2010) (en banc). With "a measure of circumspection," however, we have determined in certain cases that subsequent action by a legislature elucidates the legislature's intent in an earlier enactment. *See, e.g.*, *Jackson*, 999 A.2d at 108; *Winters*, 596 A.2d at 577. To determine if this is such a case, we cannot hopscotch through time, however. We must consider the delay provision enacted in 2013 in context; that is, we must consider what happened in the more than two and a half years between the ratification of the 2010 Charter Amendment in November 2010 and the proposal to delay the Attorney General election in July 2013.

It is with this perspective that we reject the Council and BOE's argument that the Council's "near-contemporaneous interpretation of the timing for the Attorney General election" was contained in the delay provision that ultimately became part of the 2013 Act. By 2013, a significant amount of time had passed since the Charter had been amended, and during that time the actions of the

Council reflected an understanding that an election would be held in 2014. It was in anticipation of a 2014 election that the Council took up in January 2013 the Mayor's proposed legislation to alter the structure of the Attorney General's Office.[78] And the Mayor's legislation was voted out of Committee in July 2013 with the express understanding that there would be a 2014 election.[79] The delay provision, added to the Mayor's legislation only after this point, does not constitute persuasive evidence that the Council's intent, *when it passed the 2010 Act*, was to leave the timing of the Attorney General election open-ended and entirely subject to the Council's discretion.[80] Indeed, if that were the Council's intent and

---

[78] The legislation that the Mayor proposed said nothing about the timing of the election because, it seems it was his understanding (as reflected by his letter to the Council Chairperson requesting the legislation be introduced) that the timing was already fixed by the 2010 Charter Amendment. Likewise, this legislation cannot be construed as the "implementing legislation" that the Council and the BOE now assert was needed to put the 2010 Charter Amendment in effect. Rather, the stated purpose of this legislation, proposed in anticipation of an already scheduled election, was "to ensure the best prospects for [the] long-term success of this new arrangement for both the Office of the Mayor . . . and for the OAG." It primarily clarified chains of command within the executive branch.

[79] The Committee report stated that "[i]n April 2014, the first nominees for Attorney General will be on the primary ballot, and the first elected Attorney General will take office in January 2015." *See* D.C. Council, Comm. on the Judiciary & Pub. Safety, Report on Bill 20-134 at 2 (July 3, 2013).

[80] We note that Councilmember Evans sponsored the delay provision that appellees now assert manifests the intent of the original Council. He was the sole Councilmember to vote against the 2010 Act after Councilmember Mendelson proposed the amendment clarifying that an election would be held in 2014.

(continued…)

understanding of the Charter Amendment, it is hard to explain why the Council felt the need to pass any legislation at all to delay the election. The fact that they did enact such legislation suggests that they thought an election would take place in 2014, in accordance with the 2010 Charter Amendment, unless and until they moved to stop it.

All of this—the 2010 Charter Amendment read as a whole and in the context of the greater 2010 Act, the intent of the Council, and the intent of the electorate—leads us to conclude that the 2010 Charter Amendment language "shall be after January 1, 2014" must be read as requiring an election for the office of Attorney General "in 2014." Moreover, we are not persuaded by the Council and the BOE's backstop argument—particularly pressed in their petition for rehearing or rehearing en banc—that to so construe the 2010 Charter Amendment would limit the Council's "plenary authority" under § 752 of the Home Rule Act to legislate on

---

(…continued)

Meanwhile, the sponsors of the 2010 Act—Councilmember Mendelson, and co-sponsor, Councilmember David Catania—both voted against the 2013 Act. And if we look to all eight Councilmembers who voted for the 2010 Act and who were still on the Council three years later, only four voted for the 2013 Act. Instead of reflecting their original intent, it seems these four votes for the 2013 Act reflected a change of heart—or as amici aptly characterized it, "legislative remorse."

"matters involving or relating to elections in the District."[81] While the Council's understanding of its conferred powers under the Home Rule Act cannot be ignored, the Council's view "is not entitled to weight beyond the inherent persuasiveness of the position taken in a particular instance." *Jackson*, 999 A.2d at 101 n.17 (recognizing that "the Council's interpretation of its own authority under the Home Rule Act," is not controlling because the Home Rule Act was passed by Congress, not the Council (internal quotation marks and brackets omitted)).

For the Council and the BOE to prevail on their § 752 argument, we must conclude that the Council deliberately intended the language "shall be after January 1, 2014" to be open-ended to preserve the Council's discretion to set the timing of an election for the office of Attorney General. If that were the case, we would have to defer to that choice. But we have concluded that the Council, and the electorate, intended that the election be held in 2014. And given that conclusion, there is no conflict with § 752: The Council's authority has not been limited by our interpretation of the Charter Amendment; rather, the Council has simply already exercised its "broad authority" under § 752 to call for an election

---

[81] Section 752 is codified at D.C. Code § 1-207.52 (2012 Repl.), and it provides that "[n]otwithstanding any other provision of this chapter or of any other law, the Council shall have authority to enact any act or resolution with respect to matters involving or relating to elections in the District."

for Attorney General in the 2014 election cycle by passing the 2010 Act. Once this proposal was ratified by the voters, transforming Title II of the 2010 Act into a Charter amendment, the subjects covered by Title II were no longer a matter on which the Council could legislate. Section 752 does not empower the Council to pass legislation to override or amend previously approved Charter amendments. *See Price*, 645 A.2d at 599.[82] Thus, if the Council wishes to enact legislation that conflicts with the Charter as amended, it must first seek to amend the Charter by authorized means.

*          *          *

The trial court concluded that there was no requirement that the election for an Attorney General in the District be held in 2014 and dismissed Mr. Zukerberg's complaint for failure to state a claim. For the reasons set forth in this opinion, we reversed and remanded for further proceedings.

---

[82] This court thus refuses to broadly read the "notwithstanding" language of § 752 to allow the Council to circumvent the Charter amendment process whenever the amendment relates to elections. Such an interpretation would confer upon the Council the power to override Congress's truly plenary exercise of authority to enact a Charter amendment—an absurd result. We no more understand the Council to have such power when the Charter is amended through the alternative process of passage of legislation by the Council and ratification by the voters.