Opinion for the court by Associate Judge Thompson. Dissenting opinion by Associate Judge Easterly at page 436. , THOMPSON, Associate Judge: This action arose when appellant District of Columbia (“the District”), asserting that it was acting “in its parens patriae capacity and through its Attorney General,” brought suit against defendant/appel-lee ExxonMobil Oil Corp. (“Exxon”) and defendants/appellees Anacostia Realty, LLC (“Anacostia”) and Springfield Petroleum Realty, LLC (“Springfield”) (affiliated entities sometimes hereafter referred to together as the “Distributors”), and Capitol Petroleum Group, LLC (“CPG”)[1] for declaratory and injunctive relief for claimed violations of D.C. Code § 36-303.01(a)(6) and (11) (2012 Repl.), contained in Subchapter III of a statute known as the “Retail Service Station Act” (“RSSA”). 'The Superior Court granted defendants’/appellees’ motions to dismiss the complaint, agreeing with the defendants that the District had not “established standing through common law' parens pat-ride authority” and “does not have express or implied statutory authority” to maintain this action. The District argues that the trial court erred in dismissing the complaint. We agree and therefore reverse and remand for further proceedings. I. Background A. The Allegations of the Complaint The complaint alleges that until 2009, Exxon owned a number of retail gasoline service stations located in the District, which it leased to independent retail dealers that operated the stations under franchise agreements. Under the franchise agreements, Exxon had the exclusive right to supply Exxon-branded gasoline to the retail service stations. Although refiner Exxon also had gasoline .distribution agreements with wholesale gasoline distributors in the .area, it prohibited them from supplying Exxon-branded gasoline to the franchisee retail service stations. Beginning in 2009, Exxon transferred ownership of its retail service station properties either to Anacostia or Springfield. Exxon also, assigned to Anacostia or Springfield its rights under the franchise agreements. According to the District — and this is the gravamen of its complaint — “[t]he dealer franchise agreements, and later versions of these agreements” unlawfully “compel the independent retail dealers .operating these stations to buy their Exxon-branded gasoline exclusively from — and at prices set by” Anacostia or Springfield or CPG. The complaint further alleges that Exxon continues to enforce the unlawful exclusive-supply requirement through its distribution agreements with Anacostia and Springfield, which “allow only one supplier to supply [Exxon-branded] gasoline to each Exxon-branded gasoline station in D.C.” As a result of the dealer-franchise and distribution agreements, the complaint alleges, the defendants/appellees “set the wholesale price[ ] paid for Exxon-branded gasoline in D.C.,” depriving retail dealers who sell. Exxon-branded gasoline and “many thousands of consumers in D.C.” who purchase Exxon-branded gasoline in D.C. of “the benefits of competition in the wholesale supply of Exxon-branded gasoline.” The complaint asserts that independent retail Exxon stations cannot “purchase Exxon-branded gasoline at prices below the prices charged by” the Distributors. The complaint further asserts that of the thirty-one Exxon-branded gasoline stations in the District, all of which are owned by Anacostia or Springfield, twenty-seven are operated by independent retail dealer franchisees, all of which are subject to and restricted by the allegedly unlawful dealer-franchise and distribution agreements. According to the complaint, these independent franchisee-operated retail stations comprise about 25% of the gasoline stations in the District. The complaint charges that the dealer-franchise agreements between the Distributors and independent retail service stations, and the distribution agreements between Exxon and the Distributors (all of which the District asserts constitute “marketing agreements” as that term is defined in the RSSA) violate two provisions of Subchapter III of the RSSA: D.C. Code § 36-303.01(a)(6) and (11). D.C. Code § 36-303.01(a)(6) states that: [No marketing agreement shall ...] [prohibit a retail dealer from purchasing or accepting delivery of, on consignment or otherwise, any motor fuels, petroleum products, automotive products, or other products from any person who is not a party to the marketing agreement or prohibit a retail dealer from selling such motor fuels or products, provided that if the marketing agreement permits the retail dealer to use the distributor’s trademark, the marketing agreement may require such motor fuels, petroleum products, and automotive products to be of a reasonably similar quality to those- of the distributor,. and provided further that the retail dealer shall neither represent such motor fuels or products as having been procured from .the distributor nor sell such motor fuels or products under the distributor’s trademark!.] D.C. Code § 36-303.01(a)(ll) states that “no marketing agreement shall” “[c]ontain any term or condition which, directly or indirectly, violates this subchapter.” The complaint asks for a declaration that defendants’/appellees’ marketing agreements violate these provisions of District of Columbia law and for an injunction prohibiting enforcement of the agreements. ■ B. The Trial Court’s Ruling on the Motions to Dismiss The District filed its complaint on August 27, 2013, and appellees filed then-motions to dismiss on October 7, 2013. Asserting that the RSSA sets out “a carefully crafted enforcement scheme in which the Mayor of the District of Columbia is authorized to enforce Subchapters II 'and IV of the Act” [2] and in which “retail ser: vice station dealers are authorized to enforce Subchapter III,”[3] appellees argued first that the statute makes a “clear! ] and explicit!] assignment of] separate roles,” indicating that “no public enforcement of Subchapter III was intended.” Accordingly, appellees argued, the Attorney General has no “cause of action” or “right of action” to enforce, and “no role ... in enforcing,” Subchapter III of the RSSA and that the'allegations of the complaint otherwise fail to state a claim. • - In addition to arguing that the District lacks statutory authority to sue to enforce Subchapter III of the RSSA, appellees argued that the District in its complaint failed to allege the concrete injury necessary to establish Article Ill-type standing to maintain this suit. Appellees argued that the complaint asserts in only a “vague and undefined way” that Exxon’s and the Distributors’ conduct deprives dealers and consumers of the benefits of competition. They contended in addition that the District failed to assert a “quasi-sovereign interest” — “a harm that is sufficiently severe and generalized as to threaten the economy of the District as a whole” — to support its assertion that it is suing as parens patriae. After a hearing on January 9, 2014, the Superior Court issued its May 6, 2014, Order dismissing the complaint. The court began its analysis by noting that “the RSSA does [not] provide an express statutory right for the Attorney General or Mayor to pursue violations of Subchapter III.” The court cited the provision of the RSSA that expressly gives the Mayor authority to enforce Subchapters II and IV of the statute (D.C. Code § 36 — 302.05(a)) and the provision that “expressly allows for a retail dealer to file a civil action against distributors [in certain circumstances]” (D.C. Code §-36-303.06(a)(1)) and reasoned that the “failure to give the Mayor authority to enforce violations of Subchapter III [was]' not a mere oversight.” The court further reasoned that because the RSSA contains no language making its provisions- enforceable by-“ ‘any person’ injured or aggrieved,” the statute also does not confer on the District implied authority to enforce Subchapter III. The court rejected the District’s argument that the broad authority to uphold the public interest vested in the Attorney General under D.C. Code § 1-301.81 (2012 Repl.) permits the Attorney General to sue to enforce the RSSA Looking to the then-most-recent legislative history of the RSSA, the court reasoned that the Council of the District of Columbia (the “Council”) “deliberately” and “consciously chose not to [amend the RSSA so as to] grant the Attorney General or Mayor the express ability to enforce penalties for violations of Sub'chapter III of the RSSA.” The court’s statement was a reference to Bill 19-299, proposed by the Attorney General and introduced in 2011, that would have given the Attorney General pre-complaint investigatory subpoena authority with respect to suspected violations of D.C. Code § 36-303.01(a)(6) by any refiner or dealer, as well as express authority to sue to enjoin any such violations and to recover civil penalties, attorneys’ fees, and costs. Moving to the issue of standing, the court reasoned that the District’s allegations were not “sufficiently concrete as to create an actual controversy between the District and Defendants” given that the allegations did not cite “specific effects of the unlawful marketing agreements, which affect the economy of the District.” In particular, the court reasoned, the complaint fell short because it fails to allege “that the price of ExxonMobil’s fuel is too high at service stations”; that there is a “dealer who' would want to purchase motor fuel from a third-party supplier”; that “there exists a third-party, supplier, which would sign contracts with retail dealers for lower prices”; that “retail dealers desire such competition”;[4] or “that if a retail dealer were to purchase gasoline from á third-party supplier, then that relationship would create or ensure lower prices for consumers.” The court also Remarked that the District’s allegation that none of the twenty-seven independent retail dealers can purchase Exxon-branded gasoline at prices below the prices charged by the Distributors was “conclusory and unsupported by any factual allegations,” ■ Citing Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (“Snapp”), the court rejected the District’s argument that it has standing to sue through its' parens patriae authority, reasoning that the complaint fails to “allege a quasi-sovereign interest.” The court explained that a state asserts “a quasi-sovereign interest in the health and well-being of its citizens [only] when the articulated injury is sufficiently concrete and affects a substantial segment of its population.”[5] The court remarked that the District “is essentially alleging an abstract and hypothetical injury.” The court observed in addition that the District was “requesting purely injunctive relief’[6] but had “not alleged any specific future harm” “other than generally alleging that the marketing agreements damage the competitive effects of the gasoline markets.” Reiterating that the “Council' thus far has chosen not to provide the Attorney General with authority to bring' actions under Subchapter III,” the court ruled that “[u]ntil such time as the Council changes its position, ... the Attorney General has no standing to bring actions under that Subchapter of III of the RSSA” and that the Council “clearly intended for only retail dealers to have a right of action pursuant to Subchapter III.”[7] Accordingly, the court dismissed the. complaint. This appeal by the District of Columbia followed. II. Standard of Review The trial court did not couch its rulings in terms of Rule 12(b)(1) or Rule 12 (b)(6) of the Superior Court Rules of Civil Procedure, but we treat its ruling that the District lacks eoncrete-injury-in-fact standing as a ruling under Super. Ct. Civ. R. 12(b)(1) and its ruling that only retailer dealers may sue to enforce Sub-chapter III of the RSSA as a ruling under Super. Ct. Civ. R. 12(b)(6).[8] Standing (and whether to uphold a dismissal under Super. Ct. Civ. R. 12(b)(1) for lack of standing) is a - question of law which this court considers on appeal de novo. See. UMC, 120 A.3d at 42. Our review of a dismissal under Super. Ct. Civ. R. 12(b)(6) for failure to state a claim is also de novo. Daley v. Alpha Kappa Alpha Sorority, Inc., 26 A.3d 723, 730 (D.C. 2011). “[T]he dispute between the parties in this case requires us to decide the proper interpretation of a statute, a question of law,” and our review of that issue, too, is de novo. Medstar Health, Inc. v. District of Columbia Dep’t of Health, 146 A.3d 360, 368 (D.C. 2016). III. Analysis A. Whether the District Has Standing to Maintain This Suit The trial court began its analysis by addressing the issue of whether the Attorney General has statutory authority to maintain this suit. For reasons we shall explain, that is the primary question presented by this appeal, but we begin instead with the “threshold jurisdictional question” of standing. Grayson, 15 A.3d at 229. “[E]ven though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III.” Id, at 224. “[T]he irreducible constitutional minimum of standing consists of three elements[:] The plaintiff must have (lj suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.” Spokeo, Inc. v. Robins, — U.S. -, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (internal quotation marks and citation omitted); see also Grayson, 15 A.3d at 234 n.36 (explaining that the injüry-in-fact requirement requires “an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical” (internal quotation marks and citations omitted)). We also apply prudential standing rules, i.e., “judicially self-imposed limits on the exercise .... of jurisdiction, such as the general prohibition on a litigant’s raising another person’s legal rights.” Id. at 235 (internal quotation marks omitted); Padou v. District of Columbia Alcoholic Bev. Control Bd., 70 A.3d 208, 211 (D.C. 2013) (“[Ujnder the so called prudential principles of standing, a plaintiff may only assert its legal rights, [and] may not attempt to litigate generalized grievances.” (internal quotation marks, omitted)). The Supreme Court established in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), that the legislature may “either expressly or by clear implication” “grant a[ ] ..right of action to persons who otherwise would be barred by prudential standing rules.” See id. at 501, 95 S.Ct. 2197 (“[Piersons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their .claim.”); see also, e.g., Utah ex rel. Div. of Forestry, Fire & State Lands v. United States, 528 F.3d 712, 721 (10th Cir. 2008) (“[Sítate law may create the asserted legal interest.”). To the extent this case raises, a prudential standing issue, that issue is subsumed :in our discussion in section III.B below.[9] 1. The District Was, Not Required to Assert Injury to a Quasi-Sovereign Interest to Establish Standing to Sue As Parens Patriae, In their motions to- dismiss and their arguments to the trial court,- appel-lees framed the issue of standing in this case as an issue of whether the District had asserted an interest- “sufficiently concrete [and particularized] to create an actual controversy between the state and the defendant for Article III purposes.” Appel-lees argued that to do this, the District’s complaint had to “establish an' injury to a quasi-sovereign interest,” “the most basic and -most fundamental requirement ] for parens patriae standing.” Citing Snapp, they told the court that, to establish that it was acting in pursuit of a quasi-sovereign interest, the District was required to allege “enough citizens injured,” i.e., “injury to a substantial segment of the population,” sufficient “to either damage the economy or threaten an injury to the economy.” The District’s opposition brief and the trial court’s Order largely followed that lead, and the briefs on appeal likewise focus a great deal of attention on whether the District’s complaint alleged concrete injury -to a substantial enough segment of the District’s population, such that the District was asserting a quasisovereign interest and has standing on that basis. Importantly, however, the' context of the Supreme Court’s statements in Snapp on which the parties arid the trial court have relied was its “articulat[ion of] the circumstances under which a state has parens patriae standing to bring an action [in federal court] under federal law.”[10] Massachusetts v. Bull HN Info. Sys., 16 F.Supp.2d 90, 96 (D. Mass. 1998) (emphasis added); see also Sierra Club v. Two Elk Generation Partners, Ltd., 646 F.3d 1258, 1275 (10th Cir. 2011) (“[T]he parens patriae doctrine ... is a doctrine of standing which affords state officials a platform from which to vindicate their quasi-sovereign- interests in federal court.”).[11] The Snapp Court did not purport to establish the requirements for bringing a parens patriae suit where a State (or, as here, the District) brings suit in its local court to enforce its own laws. Moreover, as we discussed with the parties at oral argument, in Snapp, the Supreme Court distinguished a quasi-sovereign interest, which “consist[s] of a set of interests that the State has in the well-being of its populace,” 458 U.S. at 602, 102 S.Ct. 3260, from a sovereign interest. The Court explained that one “easily identified” “sovereign interest[]” is “the exercise of sovereign power over individuals and entities within the relevant jurisdiction,” which “involves the power to create and enforce a legal code, both civil and criminal.” 458 U.S. at 601, 102 S.Ct. 3260. See also Louisiana ex rel. Ieyoub v. Brunswick Bowling & Billiards Corp., No. 95-104, 1995 U.S. Dist. LEXIS 3506, at *4-6 (E.D. La. Mar. 20, 1995) [stating, in remanding to state court an action initially brought there by the Louisiana Attorney General to remedy violations of state unfair trade laws but erroneously removed by the defendant to federal court, that “[t]he parties ... discuss at length parens patriae standing and whether the State has a supporting ‘quasi-sovereign’ interest in this matter. But, the State’s interest here, if any, is not quasi-sovereign, but sovereign. The State , has a sovereign interest in ‘the exercise of sovereign power,’ ” which includes “ ‘the power to create and enforce a legal code, both civil and criminal’” (quoting Snapp, 458 U.S. at 601, 102 S.Ct. 3260)). Further, the Supreme Court has instructed that a “State has standing to sue ... when [either] its sovereign [interests] or [its] quasi-sovereign interests are implicated.” Pennsylvania v. New Jersey, 426 U.S. at 665, 96 S.Ct. 2333 (discussing suits under the Court’s original jurisdiction). In addition, while the Court confirmed in Snapp that “a parens patriae action c[an] rest upon the articulation of a ‘quasi-sovereign’ interest,” Snapp, 458 U.S. at 602, 102 S.Ct. 3260 (citing Louisiana v. Texas, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900)), the Court has instructed as well that “when a State is ‘a party to a suit involving a matter of sovereign interest,’ it is parens patriae and ‘must be deemed to represent all of its citizens.’” South Carolina v. North Carolina, 558 U.S. 256, 266, 130 S.Ct. 854, 175 L.Ed.2d 713 (2010) (brackets omitted) (quoting New Jersey v. New York, 345 U.S. 369, 372-73, 73 S.Ct. 689, 97 L.Ed. 1081 (1953)). Thus, under the cases discussed above, a State’s standing to sue as parens patriae may be based on its assertion of a sovereign interest (such as when it sues to “enforce [its] legal code,” Snapp, 458 U.S. at 601, 102 S.Ct. 3260) rather than on its assertion of a quasi-sovereign interest. The implication for this case is that appellees were not entitled to prevail on their claim that the District lacks parens patriae standing to maintain this action merely by satisfying the trial court that the District had not established a quasi-sovereign interest.[12] We recognize that even after enactment of the District’s Home Rule charter, the District is merely “akin to a sovereign State.”[13] Feaster v. Vance, 832 A.2d 1277, 1287 (D.C. 2003); see also District of Columbia v. John R. Thompson Co., 346 U.S. 100, 105-08, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953) (“The subordinate legislative powers of a municipal character, which have been or may be lodged in the city corporations, or in the District corporation, do not make those bodies sovereign.” (internal,-quotation marks omitted)); District of Columbia v. Owens-Corning Fiberglas Corp., 572 A.2d 394, 404 n.26 (D.C. 1989) (“[U]nder the Home Rule Act, the District government .continues to exist as a body corporate. for municipal purposes!.]” (internal quotation marks omitted)). However, this court has, recognized that the District, which has “the burden of legislating upon essentially local District matters,” D.C. Code § 1-201.02(a) (2012 Repl.), is a sovereign for many purposes. See, e.g., Feaster, 832 A.2d at 1287 (“The District of Columbia government is thus both the de jure and the de facto sovereign with respect to local public employee labor relations in the District.”); Barnhardt v. District of Columbia, 8 A.3d 1206, 1214 (D.C. 2010) (referring to the District of Columbia’s “sovereign immunity”). Here, there is “no need for us to decide that the District has all the sovereignty of a state,” Owens-Comrning, 572 A.2d at 403, to conclude, as we do, that this case is a suit by the District based on its sovereign interest in enforcing statutory prohibitions its legislature has enacted as part of “the public policy of the District of Columbia.”[14] D.C. Code § 36-305.01 (2012 Repl.). Our dissenting colleague criticizes that conclusion on the ground that the District never advanced a sovereign-interest theory of standing. To be sure, the District’ did focus its briefing, before us and in the trial court, on whether its complaint sufficiently pled a quasi-sovereign interest, but the District has not entirely overlooked what the Supreme Court’said in Snapp about parens patriae standing and sovereign lawmaking power: The Court explained that “[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as parens patriae is’ whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.” 458 U.S. at 607, 102 S.Ct. 3260. Relying on that statement in Snapp, the District argued in its brief to us that “[t]he fact that the District not only could address, but has addressed, the threat of injury to its wholesale gasoline market through legislation .,. confirms that the alleged injury suffices to provide the District with [the] parens patriae standing” it asserted in its complaint.[15] The District made a similar argument in its brief opposing appellees’ motion to dismiss, arguing that “the appropriateness of the District seeking relief as parens patriae is strengthened by the RSSA’s explicit recognition of the public interest in enhancing honest competition in D.C.’s gasoline supply.”[16] That argument by the District accords with the Supreme Court’s statement, quoted supra, that “when a State is a party to a suit involving a matter of sovereign interest, it is parens patriae and must be deemed to represent all of its citizens.” South Carolina v. North Carolina, 558 U.S. at 266, 130 S.Ct, 854 (brackets and internal quotation marks omitted). In short, the District did not need to allege (in addition) a “quasi-sovereign interest” within the meaning of Snapp and its progeny in order to sue in the Superior Court as parens patriae to enforce District of Columbia law.[17] The trial court -erred in dismissing the complaint for what the court found was its failure to establish parens patriae standing by alleging facts necessary to show a quasisovereign interest 'under Snapp. 2. The District Sufficiently Alleged Standing By Asserting That It Was Suing, to Enforce Certain D.C. Stat- • utory Prohibitions, Which Defendants (Allegedly) Are Violating Through Their Marketing Agreements. In .addition to arguing that the District failed to allege facts sufficient to show injury to a substantial segment of its population and thus injury to a quasi-sovereign interest, appellees advance a more general argument that the District failed to establish Article Ill-type standing. Ap-pellees assert that the «District’s complaint “alleges no real and concrete injury to any citizen of the District” and, more specifically, no injury to competition, retail dealers, suppliers, or consumers, However, to repeat, the District’s complaint alleges and seeks to enjoin violations of District of Columbia law, specifically, violations of certain marketing-agreement prohibitions set out in the RSSA (“No marketing agreement shall .... ”). Case law establishes that a government is injured when its laws are violated. See, e.g., Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (“It is beyond doubt that the complaint asserts an . injury to the United States[,]” i.e., an “injury to its sovereignty arising from violation of its laws.”).[18] The. District’s argument in its brief to this court that it satisfied Article III standing requirements because “[gjovemmental entities have a concrete stake in the proper application of the laws of their jurisdiction, giving them a sufficient basis for Article III standing in parens patriae cases,”[19] is consistent with that case law. (This is an argument the District undeniably advanced, though, as our dissenting colleague emphasizes, it was overshadowed by the District’s effort to show that it sufficiently asserted a quasi-sovereign interest as articulated in Snapp.) Here, as in Stauffer, the parties have not cited — and our own research has not uncovered — “any case in which the government has been denied standing to enforce its own law.”[20] 619 F.3d at 1325. Indeed, when a jurisdiction seeks to enforce its own laws, courts have treated the question of standing as subsumed under the question of whether the entity or agency suing has statutory enforcement authority[21] — a matter that the Superior Court recognized as the primary question before it, and which we address infra. Our dissenting colleague faults us for looking to. the District’s complaint and not stopping with rejection of the District’s quasi-sovereign-interest theory ■ of standing. But, “ ‘[f]or purposes [of our review of the Superior- Court’s] ruling on a motion to dismiss for want of standing,’ ” we, like the trial court, “ ‘must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.’ ” Grayson, 15 A.3d at 232 (quoting Warth, 422 U.S. at 501, 95 S.Ct. 2197); see also id. at 247-48 (analyzing whether Grayson had standing by reviewing his allegations in the various paragraphs of his complaint). The District’s complaint alleges on its. face that appellees have in place marketing agreements that violate District of Columbia law, specifieally, prohibitions set out in the RSSA. Those allegations by the District were sufficient to satisfy the injury-in-fact element of Article- Ill-type standing on the District.[22] Appellees suggested at oral argument that an additional reason why the District’s complaint on its face does not establish Article Ill-type standing is that the RSSA already provides that marketing agreements that violate § 36-303.01 are unenforceable. Therefore, appellees implied, the court can prqyide.no additional redress. We reject this argument. To be sure, to have Article Ill-type standing, a plaintiff must assert an injury “that is likely to be redressed by a favorable judicial decision.” Spokeo, 136 S.Ct. at 1547. Here, the' parties vigorously disagree about whether § 36-303,01(a)(6), correctly interpreted, actually prohibits’ the marketing-agreement provisions thé District claims are unlawful: appellees contend, and the District disputes, that the second proviso of § 36-303.01(a)(6) (“provided further that the retail dealer' shall neither represent such motor fuels or products as having been procured from the distributor nor sell such motor fuels or products under the distributor’s trademark”) permits them to require the-franchisee retail service stations to purchase all their Exxon-branded gasoline, from Anacostia or Springfield. The dispute is a live one— appellees themselves' acknowledge that this case represents a continued effort by the Attorney General to address alleged injury to competition in the gasoline market in the District — and the declaratory relief the District seeks would resolve the dispute. Thus, contrary to appellees’ argument, a ruling by the court on this issue would not be a mere advisory opinion about the lawfulness of possible future circumstances. Similarly, the injunctive relief the District seeks would not merely preclude appellees from enforcing the challenged marketing agreements in the courts, but presumably could require affirmative rewriting of the marketing agreements and perhaps restructuring of 'the parties’ relationships. For the foregoing reasons, we conclude that the Superior Court erred in dismissing the complaint for lack of standing.[23] B. Whether the District, Through Its Attorney General, Has Authority to Sue to Enforce Marketing Agreement Prohibitions Set Out in the RSSA We next address whether the District, through its Attorney General, has authority under District of Columbia law to seek judicial relief for (alleged) violations of D.C. Code § 36-303.01(a)(6) and (11). Our analysis focuses on whether the Council expressly or by clear implication has authorized the Attorney General to maintain an action such as this to enforce D.C. Code § 36-303.01(a)(6) and (11) (or whether instead the language and legislative history of the RSSA by implication preclude the Attorney General, from maintaining this action). Appellees argue, and the trial court ruled, that the RSSA must be interpreted as affording retail service stations an exclusive right-to enforce the RSSA marketing-agreement provisions involved in this suit. Appellees asserted in the trial , court that “[n]o statutory authority exists for the Mayor, the District, or the Attorney General to enforce any provision of Subchapter III of the RSSA.” There are. several reasons why we reject.these arguments and the trial court’s conclusion. 1. The Statutory Authority of the District’s Independent Attorney General We begin by describing the general statutory authority of the Attorney General and contrasting that authority to the authority formerly conferred on the District’s chief legal officer. Prior to 2010, the “conduct of all law business of the ... District” was the responsibility of a chief legal officer — originally ■ called the “Corporation Counsel” but renamed the “Attorney General” in 2004 pursuant to a Mayor’s Order[24] — who was “under the direction of the Mayor.” E.g., D.C. Code § 1-301.111 (2009);[25] D.C. Code § 1-361 (2000); D.C. Code § 1-301 (1973). In 2010, the Council passed D.C. Law 18-160, reforming the power of the Attorney General for the District of Columbia.[26] As of the effective date of the 2010 legislation, the authority and duties of the Attorney General for the District of Columbia are as follows: (a)(1) The Attorney General for the District of Columbia ... shall have charge and conduct of all law business of the said District and all suits instituted by and against the government thereof, and shall possess all powers afforded the Attorney General by the common and statutory law of the District and shall be responsible for upholding the public interest. The Attorney General shall have the power to control litigation and appeals, as well as the power to intervene in legal proceedings on behalf of this public interest. [[Image here]] (b) The authority provided under this section shall not be construed to deny or limit the duty and authority of the Attorney General as heretofore authorized, either by statute or under common law. D.C. Code § 1 — 301.81(a)(1), (b) (emphasis added). The Committee Report to the legislation cited with approval case law explaining that: [The] duties and powers [of the Attorney General] typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive ■the attorney, general of specific powers; but in the absence of such legislative action, [the Attorney General] typically may exercise all such authority as the public interest requires. And the attorney general has wide discretion in malc-ing the determination as to the public interest. 2009 Report at 4 (quoting Florida ex rel. Shevin v. Exxon Corp., 526 F.2d 266, 268-69 (5th Cir. 1976) (emphasis added); see also id. at 4 n.13 (endorsing a statement by the National Association of Attorneys General that “the common law, if not expressly limited by constitution, statute, or judicial decision, provides power crucial to the fulfillment of an Attorney General’s responsibility”). The Report states that the common-law powers of the Attorney General, “including the right to act on behalf of the public interest, indisputably flow with the position ... absent specific constitutional or statutory guidance to the contrary.” Id. at 4. Further, noting that a September 2008 memorandum prepared by D.C. Appleseed “helped to shape the current Committee Print,” id. at 2, the Report explains (with approval) that according to D.C. Appleseed’s research: [Tjhe common law powers of the Attorney General for the District of Columbia stem from Maryland common law as the District is derived from land ceded by that jurisdiction in 1801. As such, the law in existence in Maryland — including the common law — at that time became the law of the District. These common law powers ... have since been specifl-eally modified for the- Maryland Attorney- General through the acts of the state’s General Assembly. However, no such deprivation of common law authority has been achieved through the District’s Charter or through statute. While common law powers, once as■sumed, could be abrogated by statute doing so would need to be explicit. A careful review of the District’s Charter, and relevant statutory provisions pertaining to the Attorney General’s authority, clearly reveal that no such deprivation has been achieved or attempted. Id. at 5 (internal footnotes, quotation marks, and alteration omitted). The Council believed that the legislation would allow the Attorney General “to proceed with confidence by making clear in the law that he or she is the lawyer for the District of Columbia and is thus to act as the public interest requires.” Id. at 2. In sum, the legislative history of the current District of Columbia statute describing the powers of the Attorney General expresses in unequivocal terms the intent of the Council and the District of Columbia electorate that the District’s Attorney General would be independent, and the intent of the Council that the Attorney General, no longer limited to being “under the direction of the Mayor,” would have broad .power to “exercise all such authority as the public interest requires” and “wide discretion” in determining what litigation to pursue to “uphold[ ] the public interest,” “absent specific constitutional or statutory guidance to the contrary.”[27] Id. at 4. As the District put it in its brief opposing appellees’ motion to dismiss, and as its counsel re-asserted at oral argument, under §' 1-301,81(a), the “Attorney General thus has the responsibility, and the authority, to ‘uphold the public interest’ in D.C, by litigating on behalf of the public.” (The. District “is responsible for upholding the public interest” under “D.C. Code § l-3Ql-81(a).”). The Council understood that the Attorney General’s powers in this regard could be curtailed legislatively only by statutes expressly abrogating his Or her authority in specific contexts, and directed- that (whatever limitations on the power of the Attorney General had previously been understood to exist) the revised statement of his authority was not to be “construed to deny or limit [his] duty and authority”- as established under statute or common law.[28] At least two conclusions flow from this and from the Attorney General’s legislative mandate to “uphold[ ] the public interest” and to “act as the public interest requires.” First, the independence of the Attorney General from the Mayor and the Attorney General’s Council-recognized authority, to “exercise. all such authority as the public interest requires,” 2009 Report at 4, mean that the individual holding that office has enforcement authority that may go beyond that conferred by statute on the Mayor.[29] To put a finer point on it, the independence of the Attorney General and his authority and responsibility to control or intervene in litigation as the public interest requires mean that even if the Council, in passing' the RSSA in 1977,[30] intended to limit the enforcement authority of the Mayor — and thereby the enforcement authority of the Corporation Counsel or the pre-2010 Attorney General, who served “under the direction of the May- or”[31] — to Subchapters II and IV of the RSSA, and intended not to authorize those public officials to enforce Subchapter III, it does not follow that the enforcement authority of the now-independent Attorney General is so limited. Second, the Council’s statement that any abrogation or curtailment of the Attorney General’s common-law powers “would need to be explicit” means that it was a misstep for the trial court to give the great weight it gave to the facts that the'RSSA contains no explicit affirmative statutory authority for the Attorney General to enforce D.C. Code § 36-303.01(a)(6) and (11) and likewise does not grant enforcement rights to “any person” aggrieved by a violation of the , statute. As the District argues, “[t]hat [approach] gets the analysis - backwards with regard to injunctive [and . declaratory] relief, -for which -the question should be whether the legislature has affirmatively precluded a parens patriae suit” by the Attorney General.[32] The fact that the RSSA does not create an express right of action (and may not include an implied right of action) for the Attorney General to enforce § '36-303.01(a) does not answer the question of whether the Attorney General may do so pursuant to his statutory power and duty to uphold the public interest, as recognized (or established or reinstated) by D.C. Code § l-301.81(a)(l) and (b). In its opposition to appellees’ motion to dismiss, the District made a similar point, arguing that its “enforcement authority is implied [even] in the absence of express authority [in the RSSA] to sue.” 2. The RSSA In this section, we address appellees’ argument that there is an affirmative statutory preclusion of enforcement action by the Attorney General because, under the RSSA, authority to enforce Subchapter III purportedly “is vested exclusively in service station dealers.” D.C. Code § 36-303.06(a) provides ■ in relevant part: (a) (1) In addition to any and all other remedies available to the retail dealer under this subchapter, the marketing agreement, any other statute or act, or law or equity, a retail dealer may maintain a civil action against a distributor for: (A) Failure to make such disclosures as are required by § 36-303.02; (B) Failure to repurchase as required by § 36-303.04 (b); (C) Failure to pay the full value of any business goodwill as required by § 36-303.04 (d); (D) Wrongful or illegal cancellation of, termination of, or failure to renew a marketing agreement with the retail dealer under § 36-303.03; (E) Unreasonably withholding approval of a proposed sale, assignment, or other transfer of thé marketing agreement. (2) The court may award actual damages, including ascertainable loss of goodwill as provided for in § 36-303.04 (d), sustained by the retail dealer as a result of the distributor’s violation of this subchapter and may .also grant such other legal or equitable relief as may be appropriate, including, but not limited to, declaratory judgment, specific performance, and injunctive relief. D.C. Code § 36-303.06(a)(l)-(2).[33] We take appellees’ point that, as originally codified, § 36-303.06, now entitled “Civil actions,” was entitled “Retail Dealer’s Cause of Action Against Distributor,” and that the .provision now codified as subparagraph (a)(2) was an unnumbered part of subsection (a) — a history that indicates that § 36-303.06 describes remedies available to retail dealers, not remedies more generally available. However, as the District emphasizes, the RSSA provides no express authority for anyone — retailers or anyone else — to enforce the marketing-agreement restrictions of § 36-303.01(a). Nevertheless, in Davis v. Gulf Oil Corp., 485 A.2d 160 (D.C. 1984), this court expressed “certain[ty]” that the Council “intended to permit franchisees to seek relief from franchisors’ violations of [the provision now codified as § 36-303.01(a)(10) (prohibiting marketing agreements that are for a term of “less than 1 year”) ],” even though neither § 36-303.06(a) nor any other section of the RSSA “expressly provide[s] any remedy for a violation of’ the provision. 485 A.2d at 171 n.12. We did so notwithstanding the statement in the 1976 Report that the legislation would give retail dealers “a civil cause of action against the distributor in certain circumstances.” 1976 Report at 59 (emphasis added). Thus, this court has already construed the RSSA as implying a cause of action to enforce one of the § 36-303.01(a) marketing-agreement prohibitions despite the lack of express authority for anyone to enforce those provisions. Construing the RSSA to permit the District, through its Attorney General, to enforce § 36-303.01(a)(6) and (11) can hardly be the unwarranted leap the trial court, appellees, and our dissenting colleague insist it would be. This is especially so given that, according to the District’s complaint, the alleged exclusive-dealing arrangements are the product of multiple agreements (between Exxon and the distributors/franchisors, and between distributors and retail service station franchisees). Section § 36-303.06(a), which expressly authorizes certain civil suits by retailers against their distributors suggests nothing about who should have authority to sue distributors and their suppliers to enjoin exclusive-dealing arrangements that allegedly violate § 36-303.01(a)(6) and (11).- Moreover, any suggestion that the Council intended to authorize only retailers to bring' such suits is undermined by the Council’s express recognition, in enacting the RSSA, that a retail -dealer “because of his limited resources” may be “ill equipped to sue ... a financially powerful petroleum company.” 1976 Report at 27.[34] Appellees argue, however, that § 36-302.05 cabins the authority of the District to sue to enforce the RSSA by describing the Mayor’s enforcement authority as to Subchapters II and IV while omitting mention of Subchapter III.' Section 36-302.05(a) provides that: The Mayor shall ... cause a written order to be served upon such person [who “violat[es] any provision of sub-chapter II or IV of this chapter”] directing such person to immediately cease and desist from, continuing such violation. If the person so ordered refuses or fails to comply with such order, the Mayor shall be authorized to apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction, or permanent injunction restraining such person from continuing such violation. For the reasons already discussed in section B.l above (relating to the independence of the Attorney General), we conclude that the RSSA provision describing the authority of the Mayor to sue does not address, and a fortiori does not limit, the authority of the Attorney General.' We note in addition that the context of § 36-302.05(a) is provisions, in Subchapters II and IV that call for filings with or notice to the Mayor (see § 36-302.01 (a)-(b) (2012 Repl.) and § 36-302.04 (d) (2012 Repl.)), and establish the Mayor’s power to adopt regulations to implement Subchapters II and IV (see § 36-302.04 (c)) and to.grant (and, by implication, to withhold) exemptions from prohibitions established by the two .Subchapters (see § 36-302.04 (a)-(b) and § 36-304.01 (2012 Repl.)). These provisions that establish an RSSA-implemen-tation role for the Mayor are a logical explanation for the specification of the Mayor’s authority to seek enforcement of Subchapters II and IV. A logical explanation for the absence of a provision authorizing the Mayor to seek enforcement of Subchapter III is that there are nó comparable provisions specifying an RSSA-im-plementation role for the Mayor in Sub-chapter III. That implies nothing about whether there is a role for the independent Attorney General in suing to remedy what are alleged to be “widespread and systematic” violations of Subchapter III. We conclude that the RSSA is not crafted in such a way as to compel a conclusion that the District’s independent Attorney General is affirmatively precluded from seeking enforcement of § 36-303;01(a)(6) and (11) in order'to eliminate what the District alleges are widespread and systematic violations of those provisions of Subchapter III of the RSSA. And, more important (and perhaps dispositive) in light of the discussion in section B.l above, the statute does not contain the clear expression of a legislative intent to curtail the Attorney General’s enforcement powers. Such a clear expression would be necessary for us to conclude that the independent Attorney General is foreclosed by the RSSA from exercising his statutorily recognized common-law power to sue,, in pursuit of what he believes the public interest requires, to enforce the RSSA marketing-agreement provisions that the Council determined were both necessary to foster a competitive gasoline market for the benefit of consumers and “in the interests of the public health, safety, and welfare.”[35] Nor can we agree with the trial court that the Council “deliberately” and “consciously chose” to withhold from the Attorney General' the authority to enforce Subchapter III of the RSSA when it declined or failed to adopt the 2011 and 2014 proposed- amendments that would have given the Attorney General not merely express authority to sue to enforce the RSSA, but also, inter alia, pre-complaint investigatory subpoena authority and authority to recover civil penalties. With the exception of one member, the Council that failed- to pass Bill. 19-299 in 2011 was identical to the Council that passed the 2010 legislation that recognized the broad powers of the Attorney General.[36] For that reason,[37] the Councilmembers’ failure- to pass Bill 19-299 is just-as, consistent with an explanation that they understood' that the Attorney General already possessed power to sue for declaratory and injunctive relief to enforce all of the provisions of the RSSA in pursuit of the public interest as it is with the inference (i.e., that the Council “did not intend to confer authority on the District to enforce” Subchapter III of the RSSA) that appellees draw from the failed 2011 legislation. Moreover — and this applies with respect to both the failed 2011 legislation and the similar 2014 legislation on which the Council took no action — as the Supreme Court has admonished, “[flailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute,” because “[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others.”[38] Solid Waste Agency of N. Cook Cty. v. United States Army Corps of Eng’rs, 531 U.S. 159, 169-70, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (internal quotation marks omitted); see also In re McBride, 602 A.2d 626, 637 (D.C. 1992) (“Various considerations of parliamentary’ tactics and strategy might be suggested as reasons for the inaction of ... Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence óf corrective legislation a controlling legal principle.” (quoting Helvering v. Hallock, 309 U.S. 106, 121, 60 S.Ct. 444, 84 L.Ed. 604 (1940))). Finally, appellees emphasize legislative-history language stating that RSSA Sub-chapter III (contained in Title II of the Act) “deals exclusively with private rights.” 1976 Report at 64. This language appears in a section of the 1976 Report that addresses the Title’s expected “budgetary impacts” on the District and follows a discussion of the budgetary impact of Titles I and III, which impose regular duties and responsibilities on the District of Columbia government to process informational statements, process exemption requests, promulgate rules and regulations, and perform other enforcement actions. Id. at 63-64 (stating that Title II, by contrast, “should have negligible budgetary impacts on the District” since it pertains to “private rights”). Elsewhere, however, in a non-“Fiscal Impact” section of the 1976 Report, the Council stated that the provisions of Title II of the RSSA are designed in part “to protect the general public.” Id. at 29. Moreover, the Council found that non-competitive practices, including' the “functional exclusive dealing arrangement^]” prohibited by Title II, id. at 53, would “continue to have severe detrimental impacts on consumers in the District of Columbia,” id. at 19, and that the new legislation would “enhance competition” to the benefit of consumers, id. at 22. In- addition, as already noted, the Council decreed that the provisions of the RSSA “constitute a statement of the public policy of the District of Columbia” and are “in the interests of the public health, safety, and welfare.” D.C. Code § 36-305.01. These expressions of legislative intent persuade us that dismissal of the District’s suit cannot be justified on the ground that the. RSSA provisions appellees allegedly violated pertain exclusively to retail dealers’ and franchisors’ “private rights” (so as to preclude the claimed cause of action). For 'all the foregoing reasons, we conclude that the language and legislative history of the RSSA neither require nor support a conclusion that the Council meant to deny the Attorney General the authority to enforce D.C. Code § 36-303.01(a)(6) and (H). [[Image here]] The- trial court erred in dismissing the complaint for (1) the District’s purported lack of standing and (2) the Attorney General’s lack of express statutory authority to enforce D.C. Code § 36-303.01(a). Wherefore, the judgment of the Superior Court is reversed, and the matter is remanded for further proceedings. So ordered. . Appellees describe CPG as "a service company that does not own or control any service stations and is not engaged in the sale of motor fuels in the District or elsewhere,” - . See D.C. Code § 36-302.05(a) (2012 Repl). . See D.C. Code § 36-303.06(a)(1) (2012 Repl.). , Referring to the District’s argument at the hearing on the motions to dismiss that "it was ... aware of retail dealers who wanted to seek other suppliers or distributors who would sell gasoline for a lower price,” the court remarked that "these allegations are not in the Complaint.” . As appellees emphasize, the Supreme Court stated in Snapp that for a State to maintain a parens patriae suit based on a quasi-sovereign interest, the State must “allege[] injury to a sufficiently substantial segment of its population.” 458 U.S. at 607, 102 S.Ct. 3260. Typically, the matters complained of must be of “grave public concern,” "affect [the State’s] citizens at large,” and "seriously jeopardize[ ]” their physical or economic well-being, such that the State "has an interest apart from that of the individuals affected.” Id. at 602-03, 605-07, 102 S.Ct. 3260 (internal quotation marks omitted). .In fact, the District's complaint also seeks declaratoiy relief as well as (the boilerplate) “such further equitable relief as the [c]ourt deems just and proper.” . The court did not reach the argument by defendants/appellees Anacostia, Springfield, and CPG that the District’s complaint fails to state a claim that they’ have violated § 36-303.01(a)(6). The court explained that "[b]e-cause of its ruling on standing and because the parties did not fully brief the exclusivity issue or address it at oral argument,” it would not reach a determination on "whether the plain language of the ‘exclusivity’ provision of the RSSA prbhibits a retail dealer from purchasing motor fuels from a distributor who supplies the same-branded motor fuels as the distributor with whom it has a .marketing agreement.” Assuming arguendo that the District did have' standing, the trial court found that Exxon/no less than the Distributors, “would also be liable for any violation of the RSSA because a [‘jmarketing agreement[’] also [comprises] collateral and ancillary agreements” such as the agreements between Exxon and the Distributors that allegedly require exclusive-dealing restrictions., Exxon, whose brief in this court adopts by reference the arguments of the other appellees, has not challenged that conclusion, . See UMC Dev., LLC v. District of Columbia, 120 A.3d 37, 43 (D.C. 2015) ("[A] plaintiff’s standing is properly raised as a challenge to the court’s subject matter jurisdiction via a motion to dismiss under Super. Ct. Civ. R. 12(b)(1)[.]”); Grayson v. AT & T Corp., 15 A.3d 219, 224 (D.C. 2011) (en banc) ("[W]e consider whether [the] complaint states a cause of action within the meaning of [Super. Ct. Civ. R. 12(b)(6)].”); see also Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 795 n.24 (5th Cir. 2011) ("Unlike a dismissal for lack of constitutional standing, which'should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6).”). ' . There, we discuss the power that District law confers on the Attorney General of the District of Columbia to pursue the public interest and whether the Attorney General has a cause of action to enforce Subchapter III of the RSSA. See Davis v. Passman, 442 U.S, 228, 239 n.18, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) ("[Clause of action is a question of whether a’particular plaintiff is á member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court[,]"). . The Court has required a State' seeking to sue another State in the Supreme Court in an effort to redress alleged harms to the plaintiff State’s citizens (and invoking the Court’s original jurisdiction under Art. Ill, § 2, of the U.S. Constitution) to assert an interest that rises to the level of a quasi-sóvereign interest because "if, by the simple expedient of bringing an action in the name of a State, this Court’s original jurisdiction could be invoked tp resolve what are, after all, suits to redress private grievances, our docket would be inundated.” Pennsylvania v. New Jersey, 426 U.S. 660, 665, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (denying Pennsylvania’s motion for leave to file suit as parens patriae on behalf of its citizens because the suit "represents nothing more than a collectivity of private suits against New Jersey for taxes withheld from private parties,” id. at 665-66, 96 S.Ct. 2333). . See also Dwight R. Carswell, Comment, CAFA and Parens Patriae Actions, 78 U. Chi. L. Rev. 345, 347 (2011) ("[T]he parens patriae standing doctrine allows a state to bring an action on behalf of its citizens under a federal statute whenever the state can demonstrate a quasi-sovereign interest.”) (emphasis added). Indeed, "[t]he primary justification for recognizing parens patriae standing in the States ... [is that] the States have surrendered certain aspects of their sovereignty to the federal government and, in return, are given recourse [to the federal courts] to solve their problems with other States,” Estados Unidos Mexicanos v. DeCoster, 229 F.3d 332, 337 (1st Cir. 2000); to "secur[e] observance of the terms under which [the States] participate[ ] in the federal system,” Snapp, 458 U.S. at 607-08, 102 S.Ct. 3260; arid to "assur[e] that the benefits of the federal system are not denied to [the] general population” of each State, id. at 608, 102 S.Ct. 3260. . Our conclusion that the District did not need to show a quasi-sovereign interest under Snapp should not be read to imply that the District’s interest in fostering a competitive gasoline market for the benefit of consumers would not qualify as a quasi-sovereign interest if that were the applicable test. While "increased legal protection to retail dealers” was “one of the Council's objectives in adopting the RSSA,” Dege v. Milford, 574 A.2d 288, 291 (D.C. 1990) (internal quotations marks omitted), the Council aláo found that noncompetitive practices, including "functional exclusive dealing arrangements," “will continue to have severe detrimental impacts on consumers in the District of Columbia” and that the new legislation would "enhance competition" to the benefit of consumers. D.C. Council, Comm, on Transp. & Envtl. Affairs, Report on Bill No. 1-333 at 19, 22 (Sept. 10, 1976) (the "1976 Report”); cf. Kelley v. Carr, 442 F.Supp. 346, 356 (W.D. Mich. 1977) ("Surely some of the most basic of a state’s quasi-sovereign interests include -maintenance of the integrity of markets and exchanges operating within its boundaries!!]”). The District’s complaint alleges “widespread” violations of the provision of the RSSA that prohibits exclusive dealing arrangements. And though we need not decide the issue, we are inclined to agree with the trial court that the District’s allegations about "27 retail dealers” and "thousands of consumers” “may represent a substantial segment of the District's population.” . At oral argument, the Assistant Attorney General acknowledged this, saying that "the District has an interest akin to a sovereign interest” albeit not "in the same way as a state has a sovereign interest in- our system.” She added that "[t]he District obviously does have an interest in enforcing its laws and in protecting its public” and has ‘‘sovereign authority .., delegated through ... the Home Rule Act.” . At oral argument, when asked whether the District had in effect asserted a sovéreign interest, counsel for the Distributors did not squarely disagree with that characterization, but pressed the following point; "They still have to have statutory authority to bring the lawsuit. You can't just assert a sovereign interest, .., I’ve never seen in any case whether you're asserting a sovereign interest, a proprietary interest, a quasi-sovereign interest, .where if you're suing under a statute you ■don't need some sort of authority that you can simply ignore the will of the legislature.” We address in section II.B infra whether permitting this suit to proceed would "ignore the will of the legislature.” . Neither this argument by the District nor our acceptance of it can fairly be read to say that the District may sue as parens patriae to enforce every District of Columbia law. As has been observed, “[a] statute declaring conduct ‘unlawful’ [or establishing a prohibition against certain conduct] is of a different order of magnitude with respect to public policy than a statute which determines the right of one person to recover from another, or sets the jurisdictional requirements for divorce, or governs the custody of a child, or enables a local authority to grant a license.” Shell Oil Co. v. Noel, 608 F.2d 208, 212 (1st Cir. 1979). The District argues that it is ‘‘denied p.arens patriae authority to enforce a statutory provision where "the provision in question is subject to a carefully-crafted enforcement scheme or (2) the District seeks damages without clear legislative intent that it is allowed to do so.”, We need not decide in this opinion all of the parameters of the District’s standing to enforce its body of laws. But we think it clear that the RSSA provisions in issue here state statutory prohibitions imposed to foster competition for the benefit of consumers; they are not, as our dissenting colleague suggests, mere "modifications of] common law contract rules.” Post, at 436. . Thus, contrary to the charge by our dissenting colleague, we have not “raise[d] a new theory of standing for [the District] sua sponte.” Post, at 441. . Another reason why the District's assertion of "parens patriae" status did not need to be based on an assertion of a quasi-sovereign interest within the parameters established in Snapp is that this .court has recognized, in a number of contexts, that the Attorney General may — outside those parameters — bring suit in the name of the' District of Columbia as par-ens patriae to pursue matters arising under local law. For example, this court has recognized the power of the Attorney General "to sue in a parens patriae capacity to enforce the public right to continuing application of charitable trust property to proper purposes,” Hooker v. Edes Home, 579 A.2d 608, 612, 612 n.9 (D.C. 1990), even though "the District of Columbia does not have a statute specifically authorizing” such actions. In re Ingersoll Trust, 950 A.2d 672, 675 n.1 (D.C. 2008) (internal quotation marks omitted). We cite these cases merely to underscore the point that the statement in the District's complaint that it was bringing suit in its parens patriae capacity need not be read as an invocation of the. quasi-sovereign interest/parens patriae doctrine discussed in Snapp. ■ . See also United States v. Yarbrough, 452 Fed.Appx. 186, 189 (3d Cir. 2011) ("Because . the Government has standing to enforce its own laws, [appellant’s] argument that the Government has failed to allege an injury in fact is frivolous.”); Stauffer v. Brooks Bros., 619 F.3d 1321, 1325 (Fed. Cir. 2010) ("Congress has, by enacting [a statute that prohibits falsely marking an unpatented item with the word “patent”], defined an injury in fact to the United States. In other words, a violation of that statute inherently constitutes an injury to the United States.... The partiés have not cited any case in which the government has been denied standing to enforce its own law. Because the government would have standing to enforce its own law, Stauffer, as the government’s assignee, also has standing[.]”); id. at 1327 (stating that "the United States’ sovereign injury is sufficient to confer standing upon it” and finding it unnecessary to decide whether a proprietary or a sovereign injury of the United States was implicated in the qui tam action because "either one would confer standing on the government, and therefore Stauffer”); United States v. Daniels, 48 Fed. Appx. 409, 418 (3d Cir. 2002) (rejecting, as frivolous criminal defendant's contention that his crimes did not inflict the concrete and imminent injury in fact on the United States that Article III requires, because "[a]s sovereign, the United States has standing to prosecute violations of valid criminal statutes”); Crockett v. District of Columbia, 95 A.3d 601, 605 (D.C. 2014) (reasoning that because ”[t]he Attorney General for the District of Columbia is responsible for all law business of the ... District and for upholding the public interest” ... [and] is also authorized to intervene in legal proceedings on behalf of this public interest[,] ... the Attorney General has an interest, sufficient to confer standing, in the enforcement of the criminal laws of the District of Columbia” (internal quotation marks and citation omitted)); EEOC v. Day & Zimmerman NPS, Inc., 265 F.Supp.3d 179, 192-93, 2017 WL 3613022, at *8, 2017 U.S. Dist. LEXIS 133918, at *21-22 (D. Conn. 2017) ("[W]here Congress enacts a statute that ’define[s] an injury in fact to the United States,’ and the statute shows that ‘Congress [has] determined that such conduct is harmful and should be prohibited,’ then ‘a violation of that statute inherently constitutes an injury to the United States.’” (quoting Stauffer, 619 F.3d at 1325); Newt LLC v. Nestle USA Inc., No. 09-C-4792, 2011 U.S. Dist. LEXIS 32837, at *5 (N.D. Ill. Mar. 28, 2011) ("The government always has standing to enforce its own laws[.]”); Hy Cite Corp. v. Regal Ware, Inc., No. 10-cv-168-wmc, 2011 WL 1206768, at *3, 2011 U.S. Dist. LEXIS 55011, at *10-11 (W.D. Wis. Mar. 15, 2011) ("[I]t is unlikely the government has ever been denied standing to enforce its own laws.”); cf. In re Debs, 158 U.S. 564, 584, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) ("Every government, entrusted by the very terms of its being'with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.”); Castillo v. Cameron County, 238 F.3d 339, 351 (5th Cir. 2001) ("Because the State has a sovereign interest in enforcing its laws', it has a personal stake in appealing [an] injunction that g[ave] the County discretion to violate those laws.”). . District’s Brief at 13 n.2 (quoting Glanton ex rel. ALCOA Prescription Drug Plan v. Ad-vancePCS Inc., 465 F.3d 1123, 1126 (9th Cir. 2006)). . This is not surprising; after all, the whole point of the constitutional standing analysis is "[t]o ensure the proper adversarial presentation,” Massachusetts v. EPA, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), and "assure[] the court that the issues before it will be concrete and sharply presented.” Sec'y of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). . See, e.g., Bhd. of Ry. & S.S. Clerks v. Florida E. Coast Ry. Co., 384 U.S. 238, 242 n.4, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) ("We have no doubt that the United States had standing to bring this action [alleging that defendant railroad company violated the Railway Labor Act by unilaterally promulgating a new labor agreement]” because statute “ma[d]e[ ] it the duty of the United States attorney to ‘institute in the proper court and to prosecute ... all necessary proceedings for the enforcement’ of [the section of the Act the company was] charged with violating.” (emphasis added) (quoting 45 U.S.C. § 152 Tenth (1964 ed.)); EEOC v. Celadon Trucking Servs., No. 1:12-cv-00275-SEB-TAB, 2015 WL 3961180, *10, 2015 U.S. Dist. LEXIS 84639, *31-33 (S.D. Ind. June 30, 2015) (holding that "the EEOC ... suffers an ‘injury’ sufficient to give rise to Article III standing when a violation, of Section 102 of the [Americans with Disabilities Act ("ADA”) ] occurs,” even,if “it cannot demonstrate that any of the class members [on whose behalf it sued] suffered an ‘injury-in-fact’ as a result of the allegedly unlawful inquiries and examinations” and stating that the agency’s "standing to bring a suit challenging a violation of the ADA ... stems directly from' ... the EEOC’s own statutory enforcement authority.”). ’ . Our dissenting colleague suggests that a statement by the Supreme Court in United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888) — that a government's "right ... to institute ... a suit depends upon the same general principles which would authorize a private citizen to apply to a court of justice for relief,” id. at 285, 8 S.Ct. 850 — compels the conclusion that the District did not carry its burden to establish standing to sue. Post, at 437-38. But, later that same year, the Supreme Court clarified that San Jacinto established that "the instrumentality of the court cannot ... be used ... where the United States has no pecuniary interest in the remedy sought, and is'also under no obligation to'the party who will be benefited to sustain an, action for his use, and also where it does not appear that any obligation existed on the part of the Únited States to the public or to any individual.” United States v. Am. Bell Tel. Co., 128 U.S. 315, 367, 9 S.Ct. 90, 32 L.Ed. 450 (1888) (emphasis added). The Court further clarified that the United States's standing to sue can be based on “its obligation to protect the public from the monopoly of [a] patent which was procured by fraud.” Id.-, see also id. at 368, 9 S.Ct. 90 (holding for that reason that the suit against American Bell to cancel fraudulent patents was "not excluded from the jurisdiction -of the court by want of interest in the government of the United States”). Whether appellees’ marketing agreements actually cause the type of concrete injury the trial court believed must be alleged to establish. standing will be a relevant consideration if the District succeeds on its claim that the agreements- violate § 36-303.01(a) and the court goes on to consider whether to issue a permanent injunction enjoining implementation of the offending terms of the agreements. See Ifill v. District of Columbia, 665 A.2d 185, 188 (D.C. 1995) (explaining that a permanent injunction requires the trial court to find that the balance of equities favors the moving party, meaning that-the court " ‘must look- at the interests of the parties who might be affected by the. injunction and must also examine whether the facts and the relevant law indi.cate that an injunction clearly should be granted' or denied apart from any countervailing interest' ” (brackets omitted) (quoting Universal Shipping Co. v. United States, 652 F.Supp. 668, 675-76 (D.D.C. 1987))), In determining whether to grant injunctive relief, the court would have discretion to consider, for example, whether, as a result of the offending marketing-agreement provisions, "the price of ExxonMobil’s fuel is too high at service stations," The court would also have discretion to consider the various arguments ap-pellees advanced during the hearing before the trial court (e.g., that if independent dealers move to purchase Exxon-branded gasoline from third party-suppliers of Exxon-branded gasoline, the Distributors will raise the rent on the independent dealers' leased premises, putting the dealers in no better position than they were in before; and that, “wors[tj case,” the Distributors, seeking to avoid losses, will “sell the gas station [properties] for [their] highest and best use,” selling them for condominium .development and putting the dealers out of business). The court may also consider the arguments advanced by amicus Mid-Atlantic Petroleum Distributors Association, Inc. (e.g., that dealers "desire” exclusive dealing arrangements in order "to obtain [distributors'] needed investments in their stations” and that injunctive relief "could have an unintended and unconscionably' destructive effect upon [dealers'] business ... in the District of Columbia for years to come,” including by disrupting- benefits dealers derive from current arrangements for the processing of debit and credit card transactions). . Appellees contend that, far from prohibiting the specific marketing-agreement terms the District alleges , are unlawful, • § 36-303.01(a)(6) "explicitly prohibits retail dealers from selling motor fuels purchased from third-parties under the ... Exxon trademark,” We need not address this argument because a claimed "defect in the merits of a party’s claim is not the basis upon which to determine standing.” Wilderness Soc'y v. Norton, 434 F.3d 584, 595 (D.C. Cir. 2006) (noting also that " ‘no court in the modern era 'has treáted a garden-variety substantive defect in [a party’s] claim as defeating redressa-bility.’” (quoting Mountain States Legal Found, v. Glickman, 92 F.3d 1228, 1234 (D.C. Cir. 1996))); see also Grayson, 15 A.3d at 249-52, 249 n.97 (explaining that .plaintiff Grayson, who’"allege[d] ... injury in fact[] based on the defendants’ violation of his statutory right [under D.C. Code § 28-3904 (2003) ] to the disclosure of information,” had standing "to require the cpurt to consider whether he is correct that the [statute] endows a consumer with a right to- such information,” "even if the court would .answer [that question] in the negative”; ultimately holding, however, that Grayson’s complaint failed to ”allege[] the elements of .viable claims” under § 28-3904 and that his complaint was therefore. "legally insufficient to withstand a Super. Ct. Civ. R, 12(b)(6) motion”). . See Mayor’s Order No. 2004-92, 51 D.C. Reg. 6052 (June 11, 2004) (providing also that "[a]ll references in statutes, regulations, rules, and orders to the 'Office of the Corporation Counsel,’ the 'Corporation Counsel,’ and ‘Assistant Corporation Counsels’ shall henceforth refer, respectively, to the Office of the Attorney General for the District of Columbia, the Attorney General for the District of Columbia, and Assistant Attorneys General, for the District of Columbia”). . Section 1-301.111 provided: The Corporation Counsel [now the Attorney General for the District of Columbia] shall be under the direction of the Mayor, and .have charge and conduct of all law business of the said District, and all suits instituted by and against the government thereof. He shall furnish opinions in writing to the May- or, whenever requested to do so. All requests for opinions shall be transmitted through the Mayor, and a record thereof kept, with the opinions, in the Office of the Executive Secretary of the Mayor. He shall perform such other professional duties as may be required of him by the Mayor. Sections 1-361 (2000)and 1-301 (1973) read essentially the same, except for the reference to "[now the Attorney General for the District of Columbia].” Section 1-301 used the term "Commissioner”- instead of "May- or.” .See 57 D.C. Reg. 6022 (July 16, 2010); 57 D.C. Reg. 3012 (Apr. 9, 2010); see also D.C. Council, Comm, on Pub. Safety & Judiciary, Report on Bill No. 18-65 at 1-2 (Dec. 16, 2009) (the "2009 Report”) (stating that the legislation, which "codifies the institutional independence” of the office, "provide[s] greater- structural independence” of the position, and makes clear that the Attorney General is "to act as the public interest requires”). A part of the legislation described making the position of Attorney General an elected position rather than an appointed one. See Zukerberg v. District of Columbia Bd. of Elections & Ethics, 97 A.3d 1064, 1068 (D.C. 2014). However, "[b]ecause the Council is not empowered to amend the [District of Columbia Home Rule] Charter directly, the part of ‘the bill proposing this change (Title II) was effectively a request for Congress to do so.” Id. Because Congress took no action to provide for election of the Attorney General after the legislation was transmitted to it, the Council decided to seek to amend the Charter by means of a voter x-eferendum. Id. at 1069-70. The Charter Amendment proposal providing for election of the Attorney General was presented to voters as part of the general election held on November 2, 2010, and the amend- . ment was approved by a majority of the electorate and became law after the period of congressional review. Id. at 1070. . One source of “guidance to the contrary" is D.C. Code § 23-101 (2012 Repl.), which assigns to the Attorney General of the District of Columbia responsibility to prosecute “violations of all police or municipal ordinances or regulations and ... violations of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only, or imprisonment not exceeding one year” as- well as violations "relating to disorderly conduct” or to "lewd, indecent, or obscene acts,” id. § 23-101(a) and (b); and which provides, in § 23-101(c), that "[a]ll other criminal prosecutions shall he conducted in the name of the United States by the United States attorney for the District of Columbia or his assistants, except as otherwise provided by law.” . Appellees suggested at oral argument that to recognize this broad power of the District's Attorney General under- § 1-301,81 would make ours "the-first court to hold that an attorney general of a state can sue under any statute without statutory authority.” But § 1-301.81, especially as understood in light of its ' accompanying Committee Report, itself establishes the requisite statutory authority (meaning that our analysis is most certainly not "ahistorical and atextual,” as the dissent charges), and case law from numerous other jurisdictions likewise recognizes "a broad grant of authority [to the Attorney General,] which includes the power to act to enforce [the state’s] statutes.” Botelho ex rel. Members of Alaskan Sports Bingo Joint Venture v. Griffin, 25 P.3d 689, 692 (Alaska 2001) ("Under the common law, the attorney general has the power to bring any action which he thinks necessary to protect the public interest, a broad grant of authority which includes the power to act to enfqrce Alaska's statutes.”); see, e.g., Commonwealth ex rel Beshear v. Commonwealth Office of the Governor ex rel. Bevin, 498 S.W.3d 355, 366 (Ky. 2016) ("It is [the] discretionary duty [of the Attorney General] to choose those legal matters in the area of public litigation or quasi-judicial administration in which he believes it is his official duty to intervene, except in those instances when it is mandated by the legislature for him to intervene or to refrain from intervening. If he is mistaken in his legal advocacy, the courts and quasi-judicial tribunals always retain the power to rule against him and often do on the merits but this power does not affect his standing to become a party of interest in the cause or proceeding.” (internal quotation marks omitted)); State ex. Rel. Attorney Gen. v. Burning Tree Club, Inc., 301 Md. 9, 481 A.2d 785/797 (1984) (recognizing that in states where the Attorney General possesses common-law powers, he "has broad authority to initiate those suits which he believes are necessary to uphold the public "interest"); State ex rel. Bingaman v. Valley Sav. & Loan Ass'n, 97 N.M. 8, 636 P.2d 279, 281 (1981) (discussing a provision of state law that renders due-on-sale clauses unenforceable and holding that "[i]t is clear that the attorney general not only has standing to bring this lawsuit [to enforce the due-on-sale law], but also has the power and the duty to do so" pursuant to his "discretion in, determining when the public'interest requires him to bring "a civil action on behalf of the state”); Lowell Gas Co. v. Attorney Gen., 377 Mass. 37, 385 N.E.2d 240, 247-48 (1979) (explaining, in response ,to an argument that "the Attorney General lacks standing [without] ... a statutory grant of standing," that the Attorney General's consumer fraud allegations "were appropriately, brought ... in accord with the Attorney General's common law duty to represent the public interest”); Mundy v. McDonald, 216 Mich. 444, 185 N.W. 877, 880 (1921) (“A broad discretion is vested in [the Attorney General] in determining what matters may, or may -not, be of interest to. the people generally.”); see also Associated Builders & Contractors, Saginaw Valley Area Chapter v. Perry, 115 F.3d 386, 390 (6th Cir. 1997) (citing authority under Michigan law that a court "should only prohibit the Attorney General from ... bringing an action when to do so ‘is clearly inimical to the public interest’ ”); Shell Oil, 608 F.2d at 212 C'[W]e believe it is not fanciful to suppose that the state courts of Rhode Island would permit the Rhode Island ., Attorney General to bring an action pursuant to [the State’s Motor Fuel Distribution and Sales Act] to enjoin a refiner from unlawfully discriminating in the price he charges for petroleum, or to enjoin a wholesaler or reseller from selling at retail level for less than four cents below his wholesale price [even though the , Act explicitly authorizes suits only by franchisees or distributors].”). . Thus, although perhaps interchangeable for some purposes, the terms "Mayor” and "Attorney General” are not entirely interchangeable, It was misleading for the trial court to "refer[ ] to D.C. Attorney General and Mayor interchangeably when referring to the District official responsible for enforcing the [RSSA].” . See 24 D.C. Reg. 2371 (Sept. 30, 1977). . See District of Columbia v. Pryor, 366 A.2d 141, 143 (D.C. 1976) ("Subservience to the chief executive officer of the District government is the major thesis of this ["under the direction of the [Mayor]”] provision.” (citing D.C. Code § 1-301 (1973)). . .We note by way of analogy that' “states have frequently been allowed to sue in parens patriae [for injunctive relief] to ... enforce federal statutes that ... do not specifically provide standing for state attorneys general." People ex rel. Vacco v. Mid Hudson Med. Grp., P.C., 877 F.Supp. 143, 146 (S.D.N.Y. 1995); see Snapp, 458 U.S. at 609, 102 S.Ct. 3260 (holding that Puerto Rico could "pursue the interests' of its residents in the Commonwealth’s full and equal participation in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act,” without ever analyzing whether the underlying statutes permitted a State to sue). Courts have refused to permit States (as well as others) to sue to enforce rights under a federal statute where Congress’s carefully crafted and detailed .enforcement ■ scheme “carefully limits the parties who may seek relief.” Connecticut v. Physicians Health Servs. of Connecticut, Inc., 287 F.3d 110, 113 n.2, 121. (2d Cir. 2002) (holding that State was not permitted to sue to enforce various provisions of the ERISA statute, which broadly authorizes suits by the Secretary of Labor and by an ERISA plan “participant, beneficiary, or fiduciary ... to enjoin any act or practice which violates any provision of this sub-chapter,” but also precludes the Secretary from enforcing one specified provision and authorizes States to enforce one other specified provision, see 29 U.S.C. § 1132(a)(3), (5), (7) and (b)(2) (citing Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co., 700 F.2d 889, 893 (2d Cir. 1983) (ruling that pension plans are not permitted to sue to enforce the ERISA statute))). And even where a State may sue for injunctive relief, suits for money damages may be precluded. See Hawaii v. Standard Oil Co., 405 U.S. 251, 263-64, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (reasoning that to permit both a State and its citizens to sue for damages "would open the door to duplicative recoveries”). . The "other remedies available to the retail dealer under this subchapter,” § 36-303.06(a)(1), include non-judicial remedies described in § 36-303.04 (distributor-repurchase, équipment-removal, and compensation-for-loss-of-gopdwill remedies, which themselves are "in addition to any and all other remedies available to the retail dealer under this subchapter, the marketing agreement, any other statute or act, or law or equity”). . We note that Davis was not a suit brought by a retail-dealer franchisee; it originated as a suit by franchisor Gulf Oil to recover possession of the leased retail service station premises. See 485 A.2d at 162. . D.C. Code § 36-305.01 (stating that "[t]his chapter shall constitute a statement of the public policy of the District of Columbia” and that ‘‘[t]he provisions of this chapter shall be liberally construed in order to effectively early out the purposes of this chapter in the interests of the public health, safety, and welfare”). . See the lists of members of the Council of the District of Columbia set out in the District of Columbia Official Code, 2010 Supplementary Pamphlet for Volume 2 Title 1, at III; and District of Columbia Official Code, 2011 Supplementary Pamphlet for Volume 2 Title 1, at III. .Cf. Jackson v. District of Columbia Bd. of Elections & Ethics, 999 A.-2d 89, 106 (D.C. 2010) (en banc) (taking into account that "the Council that authored and, in April 1978, began consideration of the bill that became the [Initiative Procedures Act] was largely the ' same Council that passed the [Charter • Amendments Act] in May 1977”). . The District’s brief explains that a controversial aspect of Bill 19-299 was a provision that would have' prevented distributors from operating gasoline stations in the District.